COURT OF APPEALS OF VIRGINIA

Present:  Judges Beales, Huff and Senior Judge Annunziata

**UNPUBLISHED**

FATHIMA WILSON

v.      Record No. 0475-20-1

NORFOLK DEPARTMENT
 OF HUMAN SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
NOVEMBER 10, 2020

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

(B. Cullen Gibson, on brief), for appellant.

(Erikka M. Massie; Bernard Pishko; Romy L. Radin, Guardian *ad
litem* for the minor child; Office of the City Attorney; Radin Law,
PLC, on brief), for appellee.


Fathima Wilson (mother) appeals the orders terminating her parental rights and approving

the foster care goal of adoption.  Mother argues that the circuit court erred by terminating her

parental rights under Code § 16.1-283(C)(2) because termination was not in the child's best interests

and mother had substantially remedied the conditions requiring the child's continued placement in

foster care.  Upon reviewing the record and briefs of the parties, we conclude that this appeal is

without merit.  Accordingly, we summarily affirm the decision of the circuit court.  See Rule

5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 168 (2014)).

Mother is the biological parent to the child who is the subject of this appeal.[2] The child first entered foster care on April 30, 2015, after mother had been arrested for leaving the then six-year-old child unsupervised.[3] The Norfolk Department of Human Services (the Department) offered services to mother, but she did not make sufficient progress for the child to be returned to her care. On July 13, 2016, the child was placed with his paternal cousin.

On October 20, 2017, the paternal cousin brought the child, who was almost nine years old, to the Kempsville Center for Behavioral Health, where witnesses saw the paternal cousin strike, choke, and curse at the child. The Department worked with the paternal cousin and the child, who had been diagnosed with attention deficit disorder, disruptive mood disorder, and oppositional defiant disorder. On January 10, 2018, however, the Department removed the child from the paternal cousin's home. Mother was unable to care for the child because she did not have stable housing.

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] Father voluntarily terminated his parental rights to the child.

[3] Mother testified that she had arranged for a babysitter to watch the child, but the babysitter did not do so.

The Norfolk Juvenile and Domestic Relations District Court (the JDR court) entered an emergency removal order and a preliminary removal order. The JDR court subsequently adjudicated that the child was abused or neglected and entered a dispositional order.

The Department discovered that the child was not taking his medications and his individualized education program (IEP) at school had been canceled; therefore, the Department referred him for a psychological evaluation, medication management, and individual therapy. The Department was able to "put his IEP back in place." The Department determined that the child required a therapeutic foster home due to his special needs and behavior.

Mother's situation had not improved since the child previously entered foster care, so the Department provided similar services and requested updated information. The Department required mother to obtain and maintain stable housing and employment. The Department referred mother for a psychological evaluation and parental capacity assessment, parenting classes, medication management, and substance abuse treatment. The Department also arranged for a reunification worker to assist mother as needed.

Mother complied with some of the requirements. Mother was "regularly employed," although she changed jobs several times. In addition, she completed the psychological evaluation and parental capacity assessment. Mother had been diagnosed with bipolar I disorder and schizoaffective disorder, bipolar type (ruled out); she had a history of starting her medication but not continuing to take them in the maintenance phase. Mother also participated in Second Chances Relapse Prevention Group for substance abuse treatment; however, she admitted to the social worker three or four months before the circuit court hearing that she continued to drink wine on the weekends even though she knew that she should not do so because of her psychotropic medications.

The Department also required mother to obtain and maintain stable housing, which consistently was an issue while the child was in foster care. Mother had moved and was evicted several times. Mother had been homeless and had lived in shelters, with friends, and transitional housing. At the time of the circuit court hearing, she was living in transitional housing.

Moreover, the Department discovered that mother had married a registered sex offender. The Department explained to her that if she was married to a registered sex offender, the child could not live with her. In February 2019, she reluctantly divorced him.

The Department offered mother supervised visitation with the child. The Department acknowledged that mother had a "very positive relationship" with the child and that they had a "close bond." The child, however, could be "manipulative," and mother could "[s]ometimes" redirect him appropriately and other times needed assistance.

The Department continued to work with mother even after the child had been in foster care for twelve months because it recognized that she was trying. Mother, however, was too inconsistent and had not made progress, so in September 2019, the Department changed the foster care goal to adoption. On October 4, 2019, the JDR court approved the foster care goal of adoption. On January 10, 2020, the JDR court terminated mother's parental rights. Mother appealed the JDR court's rulings. Although it did not normally do so, the Department reinstated mother's services after the JDR court terminated her parental rights because the social worker believed that mother still needed them.

On February 26, 2020, the parties appeared before the circuit court. The Department questioned mother's ability to care for the child because she did not have stable housing and employment. Mother had "been in and out of shelters" and could not hold a steady job. Mother was cooperative with the Department but inconsistent with services, including her medication and individual therapy. The social worker testified that mother would "take two steps

- 4 -

forward . . . [and] four backwards." The social worker explained that despite all the services, mother "still need[ed] to deal with her mental health, her substance abuse, housing, [and] employment."

Alisha Taylor, a reunification worker with the Bair Foundation, had worked with mother since May 2019. Taylor testified that mother was cooperative but continually struggled with obtaining stable housing as she moved between emergency shelters, transitional housing, and living with friends. Taylor talked with mother about budgeting and saving money for a security deposit, but mother had "setbacks, lost jobs, . . . [and] some issues with health." Taylor testified that mother's inability to secure housing was not just because of financial problems, but also because of "mental health issues."

The Department presented evidence that the child needed structure and "substantial" supervision. The child's foster mother testified that the child had a "very busy" and "very tight" schedule. He attended counseling once a week, and he had a tutor to help him with schoolwork. The foster mother explained that the child was doing better in school academically and behaviorally; however, he could "absolutely be a handful outside of school" because he would wander off and take things. The foster mother testified that the child needed "full-time care" because he could not be unsupervised even though he was eleven years old.

At the conclusion of the Department's evidence, mother moved to strike, which the circuit court denied. Mother testified about her employment history and explained that she had started her most recent job two weeks before the circuit court hearing. She had worked at one job from July 2018 until April 2019, and then had obtained another job where she worked until January 2020. Mother explained that she had some reactions to her medicine, which caused her to be "sleepy" at work, and she was late for work occasionally due to transportation issues.

Mother testified that she was saving her money and expected to be able to obtain housing very soon. She also hoped to have assistance with the child from "different agencies" or "different associations." Mother anticipated having someone stay with the child in the afternoon and coordinate his schedule; however, she admitted that she was "new to this" and unsure of exactly what she needed. Mother recognized that she may need to change her shift at work if she had custody of the child. She currently worked the midnight shift at work, but there was an open position on the daytime shift that she could apply for after she completed the necessary training.

Mother testified that she took her prescribed medication and participated in individual therapy and group therapy.[4] She also stated that she completed the parenting classes. Mother presented her certification of completion with the Second Chances Relapse Prevention Group program and denied drinking wine except during holidays. She claimed to have been "clean" of narcotics for more than twelve years.

When asked about her ex-husband, mother testified that they married in 2012 but did not live together. After they married, she discovered that he was a sex offender. She did not want to divorce him but did so because the Department told her that the child could not live with her if she was still married to a sex offender.

Mother described her relationship with the child as very close. She acknowledged that the child "might have his moments," and she had had "to correct him." She also admitted that at times the child did not listen to her, and she had to get assistance from the reunification worker. Mother asked the circuit court for "another chance" until she could secure stable housing, which she expected to obtain quite soon.

---

[4] Mother admitted that her health insurance had lapsed between 2016 and 2018, and she required the Department's assistance to obtain new medication.

After hearing all the evidence and arguments, the circuit court terminated mother's parental rights under Code § 16.1-283(C)(2) and approved the foster care goal of adoption. This appeal followed.

## ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Mother argues that the circuit court erred in terminating her parental rights under Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Yafi, 69 Va. App. at 52 (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005)).

Mother contends that she substantially remedied the conditions that led to the child's continued foster care placement. Mother emphasizes that she had a job, completed the parenting

classes and the Second Chances program, took her prescribed medication, and attended individual and group therapy. Mother admits that housing remained an issue but asserts that termination was not in the child's best interests because of their close bond.

The circuit court acknowledged mother's love for the child; however, it also found that mother had not been able to obtain and maintain stable housing. The circuit court further found that mother had "made progress, that she ha[d] advanced on certain levels" but doubted that she would have resolved the remaining, outstanding issues by the time she had stated. The circuit court noted that mother had been employed in her new job for only two weeks at the time of the hearing and that other barriers, such as transportation, remained. In addition, after hearing the testimony about mother's ex-husband being a sex offender and about how mother only "grudgingly" divorced him, the circuit court questioned "what kind of judgment . . . [she] used and will use or would use in the future insofar as [the child] is concerned." The circuit court concluded that despite the numerous services offered by the Department, mother was unable, not unwilling, to remedy substantially the conditions that led to the child's continued foster care placement.

The child had been in and out of foster care since 2015, with the most recent removal in January 2018. He had behavioral and mental health concerns that required constant supervision and structure. The evidence proved that mother was not ready, or able, to meet the child's needs. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)). Considering the totality of the

evidence, we cannot say that the circuit court erred in terminating mother's parental rights under

Code § 16.1-283(C)(2) and approving the foster care goal of adoption.[5]

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed.  Rule 5A:27.

Affirmed.

---

[5] With respect to mother's appeal of the order approving the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans."  Toms, 46 Va. App. at 265 n.3.