COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, Decker and Russell
Argued by teleconference

**PUBLISHED**

ADAM YAFI

v.      Record No. 0529-18-4

STAFFORD DEPARTMENT OF
 SOCIAL SERVICES

OPINION BY
JUDGE ROBERT J. HUMPHREYS
NOVEMBER 27, 2018

FROM THE CIRCUIT COURT OF STAFFORD COUNTY
Victoria A. B. Willis, Judge

James J. Ilijevich for appellant.

(Catherine Miller Saller; Elizabeth Carpenter-Hughes, Guardian *ad
litem* for the minor child; Williams Stone Carpenter Buczek, PC, on
brief), for appellee. Appellee and Guardian *ad litem* submitting on
brief.

By order dated March 27, 2018, the Circuit Court of Stafford County (the "circuit court")

granted the Stafford Department of Social Services' ("DSS") petition to terminate appellant

Adam Yafi's ("Yafi") parental rights to L.Y., pursuant to Code § 16.1-283(E)(iii) and

16.1-283(E)(iv). The circuit court found by clear and convincing evidence that termination was

in L.Y.'s best interests after Yafi was convicted of felony child abuse resulting in serious bodily

injury to Y.Y., L.Y.'s half-brother, and because Yafi subjected Y.Y. to aggravated

circumstances.[1] On appeal, Yafi alleges the following assignments of error:

> 1. The [circuit] court erred by finding that the parental rights of
>    the appellant should be terminated when the Department of

---

[1] Yafi and Hayat Benfaraj are L.Y.'s biological parents. L.Y. is the subject of this appeal.
Yafi also has another son, Y.Y. Hafida Mouali is Y.Y.'s biological mother. In late January 2017,
Y.Y. was four years old, and L.Y. was almost eighteen months old. In concluding that Yafi's
parental rights to L.Y. should be terminated pursuant to Code § 16.1-283(E)(iv), the circuit court
specifically relied upon the evidence that Yafi had assaulted and abused Y.Y.

Social Services failed to present sufficient evidence that it provided reasonable and appropriate efforts to assist the appellant to remedy the conditions which led to the child's foster care placement.

2. The [circuit] court erred by finding that the parental rights of the appellant should be terminated pursuant to Va. Code Ann. § 16.1-283 (E) when the Department of Social Services failed to present sufficient evidence that the appellant was the cause of injuries to a minor child and that termination was in the best interest of the minor child when there was no evidence that she was a victim of abuse or neglect.

## I. BACKGROUND

On January 27, 2017, Deputy Scott Fulford ("Deputy Fulford") of the Stafford County Sheriff's Office received a rescue call for the Yafi residence. Deputy Fulford was later told to meet the ambulance and first responders at Mary Washington Hospital.

At the hospital, Deputy Fulford observed the ambulance transporting Y.Y., a four-year-old child. Deputy Fulford initially observed "a very large lump" on the center of Y.Y.'s forehead, as well as other visible bruises and scratches. Upon closer examination, Deputy Fulford observed "red marks on his left cheek[,]" "a large black and blue bruise on his right temple[,]" and red scratch marks on his neck that "appeared to be recent, as well as scratch marks that appeared to be old." Deputy Fulford also noted numerous bruises and abrasions on Y.Y.'s left shoulder, left wrist, and right forearm, and both elbows and knees. As Y.Y. was being examined, Deputy Fulford was able to take photographs of the child's injuries. Although Y.Y. appeared to be asleep to Deputy Fulford, Y.Y.'s injuries were so severe that they caused a coma, seizure, permanent blindness, permanent brain tissue loss, and a change in Y.Y.'s remaining brain tissue. Additionally, Y.Y.'s T1 vertebra was "crushed into multiple pieces."

Due to the nature and severity of Y.Y.'s injuries, Y.Y. was flown to the pediatric intensive care unit at Virginia Commonwealth University ("VCU") Medical Center. There, Y.Y. was treated by Dr. Robin Foster ("Dr. Foster"), a pediatric emergency medicine physician and

director of the child protective team.  When Dr. Foster first examined Y.Y. on January 27, 2017,

she noted that

> [Y.Y.] was intubated in our pediatric intensive care unit, which
> means he had a breathing tube in and was being mechanically
> ventilated.  His exam was notable for bruising that was present in
> the middle of his forehead that was somewhat purplish in
> coloration.  Bruising was present on the right side of his eye,
> lateral to his eye.  He had a large hematoma bruise on his left scalp
> that was soft and boggy and had linear abrasions through the
> surface of it.  His right eyelid was drooping, which is called ptosis.
> His right eye was laterally deviated and stuck over here off center.
> His right pupil was blown and very enlarged and fixed and would
> not respond to light.  And his left pupil was smaller, but also not
> responsive to light.
>
> On his eye exam, you could see blood that was pooling in the back
> of the eye using an ophthalmoscope.  He had several other
> scattered bruises on his trunk and a large circular bruise on the
> inside of his right forearm and several scattered bruises on his
> lower extremities as well.  He was agitated and moving his arms
> and legs in sort of a random fashion, not consistent with a seizure.

No family members were present when Dr. Foster first observed Y.Y.  Dr. Foster also noted that,

while Y.Y. was awake when she first met him, "his arms and legs were moving and thrashing

around with the airway breathing tube in place . . . [h]e was trying to talk around the tube, which

you can't really do, . . . [a]nd so he held on to my hand and wouldn't let go."

At some point, Dr. Foster reviewed the Mary Washington Hospital records that contained

reports from emergency personnel who responded to the Yafi residence.  Dr. Foster found that

the first responders observed Y.Y.'s limbs in an extended, decerebrate posture.  According to

Dr. Foster, such posturing is consistent with chronic brain injury or a seizure.  The records also

reflected that Y.Y. was foaming at the mouth, which, according to Dr. Foster, was also consistent

with a seizure. Doctors at Mary Washington Hospital rated Y.Y. as a three on the Glasgow Coma Scale.[2]

When Dr. Foster reviewed CT and MRI scans taken at both Mary Washington Hospital and VCU Medical Center, she observed various blood collection areas on both sides of Y.Y.'s brain. Dr. Foster described that Y.Y. suffered from subacute, acute, and chronic blood collection. As explained by Dr. Foster, subacute blood collection "is indicative of blood that is more than three or four days of age and less than two weeks of age." Acute blood collection "is less than four to seven days" of age. Chronic blood collection "is greater than two weeks of age." Dr. Foster compared Y.Y.'s injuries to those suffered by an inadequately restrained individual involved in a "high speed motor vehicle accident in which there is a rapid acceleration-deceleration and the brain shifts within the skull[.]"

Y.Y. remained hospitalized at VCU Medical Center from January 27 to February 20, 2017. During that time, Y.Y. suffered from multiple ongoing issues in addition to his injuries. Y.Y. "had significant issues with feeding . . . secondary to [his] underlying neurologic issues." Y.Y. also worked with a number of specialists to aid with his rehabilitation, including occupational therapists, physical therapists, and neurologists. Psychologists and psychiatrists also treated Y.Y. because he suffered from post-traumatic stress disorder and anxiety.

Shortly before Y.Y.'s transport to VCU Medical Center, Kathryn Burner ("Ms. Burner"), a child protective services worker and DSS employee, went to Mary Washington Hospital and observed Y.Y. According to Ms. Burner, Y.Y. was unconscious at the time and appeared to have multiple injuries. While at the hospital, Ms. Burner learned that Y.Y.'s father, Yafi, had been

---

[2] The Glasgow Coma Scale is a scale of "fifteen to three[,]" with three being the lowest score possible. Based on Y.Y.'s score of three, "he was not verbally responsive" or "responsive in terms of motor" control, "[a]nd his condition was that of being in a coma."

brought to the hospital on January 24, 2017, following an attempted suicide. Yafi was in intensive care, unresponsive, and on life support at that time.

Ms. Burner eventually travelled to the Yafi residence after learning that another child, L.Y., resided at the home. Police officers accompanied Ms. Burner. There, she met Hayat Benfaraj ("Benfaraj"). Also present at the residence was Y.Y. and the children's paternal aunt, Majida Yafi ("Majida").

Majida arrived in the United States from Morocco on January 26, 2017. After visiting with her hospitalized brother, Yafi, at Mary Washington Hospital, Majida went to the Yafi residence and asked to see Y.Y. Majida wanted to see Y.Y. because she had never met him in person. Benfaraj initially told Majida that Y.Y. was asleep. At some point, however, Benfaraj brought Y.Y. to visit with Majida. Majida immediately noticed that Y.Y. could not see and asked Benfaraj what was wrong with Y.Y. and his eyes. Benfaraj told Majida that Y.Y. had an eye infection, which he might have caught from L.Y. Majida could hear Y.Y. crying after Y.Y. returned to his bedroom. After checking on Y.Y. and sitting with him, Majida witnessed Y.Y. begin to suffer a seizure. The seizure prompted Majida to call 911.

Ms. Burner observed various abnormalities during her tour of the Yafi residence. For example, Ms. Burner noted that Y.Y.'s room did not have any "decorations or toys or anything to indicate a little boy's room." L.Y.'s room, however, did have those things. Benfaraj also showed Ms. Burner the area where Y.Y. allegedly injured himself and even demonstrated how. According to Ms. Burner, "[Benfaraj] would get down on the floor and bang her head . . . [s]he banged herself up against the wall where the dining table was in the kitchen area going down the hall. She also demonstrated in the bathroom banging herself on the floor." Benfaraj told Ms. Burner and the police that she did not seek medical attention for Y.Y. earlier because Y.Y. did not have medical insurance.

In addition to explaining the causes of Y.Y.'s injuries, Benfaraj showed police officers a cell phone video of Y.Y. In the video, an officer observed Y.Y. "slumped down" on a couch. The officer could observe multiple bruises on Y.Y.'s head and forehead, as well as one of Y.Y.'s eyes partially closed with a small pupil. Subsequently, an "agitated and somewhat accusatory" male voice asked Y.Y., "what happened to him, why he would do this and asking him over and over again, . . . why would you do this to yourself." After seizing the cell phone and obtaining a search warrant for its content, the officer learned that the time stamp on the video was January 23, 2017.

Ms. Burner subsequently prepared a safety plan with Majida so that Benfaraj was not left alone with L.Y. Ms. Burner then left the Yafi residence to contact VCU Medical Center to obtain more information about Y.Y. Sometime in the afternoon of January 27, 2017, and after speaking with medical personnel at VCU Medical Center about Y.Y.'s injuries, including Dr. Foster, Ms. Burner determined that L.Y. was in imminent danger and removed L.Y. from the Yafi residence. Aside from some minor bruising on L.Y.'s leg, which was not noted in Ms. Burner's affidavit for emergency removal, Ms. Burner did not observe any injuries to L.Y. at that time.

After the initial interview, Benfaraj contacted the police and requested a second interview. During the second interview, Benfaraj stated that on January 24, 2017, Y.Y. was sitting at the kitchen table when Yafi became upset with Y.Y. According to Benfaraj, Yafi kept telling Y.Y. to open his eye. After Yafi took Y.Y. to the bathroom, Benfaraj heard yelling and commotion. When Benfaraj asked what happened, Yafi said "something to the effect of, I'm dealing with my son or I'm talking with my son." According to Benfaraj, Yafi told her that he had "struck" Y.Y. and then left the house. Benfaraj stated that when Y.Y. came out of the bathroom, he had a "welt or lump in the middle of his forehead," which was not present before.

- 6 -

On January 31, 2017, an emergency removal hearing was held in the Stafford County Juvenile and Domestic Relations District Court (the "J&DR court"). The J&DR court granted DSS custody of L.Y. and subsequently entered an emergency removal order reflecting that decision. There was no emergency removal hearing concerning Y.Y. because he was in his biological mother's legal custody.

Also on January 31, 2017, DSS held a family partnership meeting to discuss the possibility of relative placements for L.Y. During the meeting, Majida reported that she was not interested in taking custody of L.Y. and that she planned to return to Morocco. Other relatives present at the meeting informed DSS that they "did not want to get into the middle of it" and did not want custody of L.Y. While a family friend indicated that he was interested in custody and was instructed by DSS on how to file for custody, the J&DR court dismissed the petition after he failed to appear at a preliminary removal hearing where the petition was scheduled to be heard. Throughout the case, neither Yafi nor Benfaraj identified any other possible placements.

On February 3, 2017, a preliminary removal hearing took place. There, the J&DR court placed L.Y. in the custody of DSS, adopting the facts contained in the affidavit for emergency removal. L.Y. was then placed in foster care. At the time of the hearing, Yafi was still in the hospital and could not attend.

On February 28, 2017, the J&DR court entered an adjudicatory order finding that L.Y. was abused or neglected. The J&DR court set a dispositional hearing for March 28, 2017, and ordered DSS to prepare a foster care service plan in accordance with Code § 16.1-281. As reflected in the foster care service plan, the program goal for L.Y. was "Return to Own Home," with a concurrent goal of "Relative Placement." The foster care service plan also contained a detailed discussion about how L.Y. came into the care of DSS and the injuries sustained by Y.Y. Notably, the foster care service plan indicated that Benfaraj had been arrested, incarcerated, and

denied bond on charges related to the abuse and neglect of Y.Y. It also indicated that "Mr. Yafi is alluding [sic] law enforcement due to warrants for his arrest in regards to the life-threatening injuries of [Y.Y.]" As stated in the foster care service plan,

> [c]onsidering the horrific injuries sustained by [Y.Y.] while in the care of Mr. Yafi and Ms. Benfaraj, lack of intervention by either caregiver, and lack of medical treatment for [Y.Y.]; the agency is concerned as to whether [L.Y.] could ever safely return to either caregiver. It is challenging to determine what services can rehabilitate a parent who has caused life-threatening injuries to a child.

At the dispositional hearing on March 28, 2017, the J&DR court adopted the foster care service plan, which had the goals of "Return to Own Home" and "Relative Placement," and set a foster care review hearing for July 25, 2017. As part of the disposition order entered that same day, the J&DR court permitted Yafi "reasonable visitation" with L.Y., at the discretion of DSS, and "when the criminal charges have been disposed and the parent is not incarcerated."

After being released from the hospital, Yafi was indicted on multiple charges related to the abuse and neglect of Y.Y.[3] Yafi's charges were summarized by DSS in a second foster care service plan, dated June 20, 2017. There, DSS also summarized its dilemma in formulating services for Yafi, which reemphasized concerns contained in the first foster care service plan. According to DSS,

> [t]he primary barrier to achieving the goal of reunification is that the biological parents are incarcerated . . . . [T]here is ongoing court involvement and both parents are facing felony convictions for abuse and neglect of [Y.Y.] at this time . . . .
>
> Mr. Yafi is incarcerated but being held at a medical facility for treatment. Mr. Yafi is charged with Aggravated Malicious

---

[3] Benfaraj faced similar charges related to the abuse and neglect of Y.Y. On July 17, 2017, Benfaraj entered into a plea agreement in which she pleaded guilty to one count of child cruelty/neglect/abuse, in violation of Code § 18.2-371.1(A). On September 22, 2017, the circuit court entered an order sentencing Benfaraj to six years in prison, with four years and six months suspended. See Benfaraj v. Stafford Dep't of Social Servs., Record No. 0597-18-4, this day decided.

Wounding (Class 2 Felony), Child cruelty/Neglect/Abuse, and Cruelty and Injury to a Child, and Child Neglect. A representative of this agency visited with Mr. Yafi on April 19, 2017. An additional visit was attempted in May 2017, but this worker was not allowed to visit as Mr. Yafi was not at the facility and had been taken to the hospital where he is not allowed visitors. Due to Mr. Yafi's incarceration and grave medical issues, Mr. Yafi cannot fully work on a service plan towards the goal of reunification. It is unknown if or when he would be released. Additionally, his ongoing medical needs require hospitalization and he may be physically incapable of caring for [L.Y.].

Another barrier to goal achievement is the agency's serious concerns as to whether [L.Y.] could ever be safe with either parent given the severity of her brother's injuries, lack of intervention by either caregiver, and unwillingness and/or inability to acknowledge their role in the abuse and neglect. It is challenging to determine which services could rehabilitate a parent that has abused and neglected a child to the point that he has permanent physical disabilities.

DSS also warned that it would "pursue the goal of adoption if significant progress and recommendations are not made to return [L.Y.] home to her parents."

On December 19, 2017, the J&DR court terminated Yafi's parental rights to L.Y. and approved the goal of adoption, which Yafi appealed to the circuit court. On February 5, 2018, the circuit court entered a conviction order accepting Yafi's <u>Alford</u> plea to the charge of aggravated malicious wounding and guilty plea to the charge of child neglect. Yafi's sentencing was set for a date beyond the date scheduled for the trial regarding the termination of his parental rights.

On March 13, 2018, Yafi appeared before the circuit court for a parental termination hearing. There, Dr. Foster, Deputy Fulford, and Ms. Burner testified, among others. Notably, Dr. Foster opined that none of Y.Y.'s injuries was consistent with Y.Y. allegedly running into walls and that his injuries could not have been self-inflicted. While Dr. Foster indicated that she could not absolutely say that all of Y.Y. injuries were "inflicted" rather than "accidental," she testified that "the constellation of injuries . . . demonstrate that [Y.Y.] was repetitively injured at least two or more times." Dr. Foster also testified that the fracture of Y.Y.'s T1 vertebra was clearly a

non-accidental injury because "[i]t's a very unusual injury" that "requires a directed blunt force, whether he was impacted into something or whether something was impacted into him . . . it requires a severe level of force to smash the spinal process and is not seen in normal childhood falls[.]" According to Dr. Foster, Y.Y.'s injuries may have resulted in less permanent damage had he received immediate medical attention.

DSS also presented evidence that when L.Y. entered foster care, she was in good health, aside from having a blocked tear duct in her eye, which was later resolved. DSS presented additional evidence through the testimony of ShaKia Robinson ("Ms. Robinson"), a family services worker assigned to the case. Ms. Robinson testified that L.Y. had been in the same foster home since January 27, 2017, and that she was "doing very well." According to Ms. Robinson, L.Y. had bonded with her foster family and was attending daycare, where she could socialize with other children. The social worker testified that since entering foster care, L.Y. "has gone from walking to running . . . . She is speaking English. She can identify colors, body parts. She can name shapes. She can identify a friend in the classroom . . . . She is potty trained completely . . . . She's expressive. She laughs . . . . She sleeps through the night as well."

After hearing all of the evidence presented and after Yafi renewed his motion to strike, the circuit court terminated Yafi's parental rights. The circuit court found that "[e]xtensive expert testimony clearly established that [Y.Y.] had been physically abused." After recounting the numerous injuries that Y.Y. sustained, the circuit court addressed Yafi and the issue of whether Code § 16.1-283(B), or Code § 16.1-283(E)(iii) and 16.1-283(E)(iv) applied. Noting that Yafi entered an Alford plea to aggravated malicious wounding and also pleaded guilty to child neglect, the circuit court found that the present matter fell under Code § 16.1-283(E)(iii) and 16.1-283(E)(iv). According to the circuit court, "[b]ecause of this finding, the Court feels that this answers the question as to services. Because [Code §] 16.1-283 removes the requirement of

- 10 -

services in such instances." Thereafter, the circuit court found that the termination of Yafi's residual parental rights was in L.Y.'s the best interests.

On March 27, 2018, the circuit court entered an order for the involuntary termination of Yafi's residual parental rights, pursuant to Code § 16.1-283(E)(iii) and 16.1-283(E)(iv). This appeal follows.

## II. ANALYSIS

### A. Standard of Review

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168, 754 S.E.2d 922, 927 (2014) (quoting Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 303, 746 S.E.2d 509, 513 (2013)). Where the circuit court's judgment is based on evidence heard *ore tenus*, its decision to terminate a parent's rights is entitled to great weight and "will not be disturbed on appeal unless plainly wrong or without evidence to support it." Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (quoting Peple v. Peple, 5 Va. App. 414, 422, 364 S.E.2d 232, 237 (1998)). Therefore, this Court will not reverse the circuit court's judgment terminating Yafi's parental rights unless the evidence, viewed in the light most favorable to DSS, was insufficient to support it.

### B. Reasonable and Appropriate Efforts

In his first assignment of error, Yafi argues that the circuit court erred in terminating his parental rights because DSS failed to present sufficient evidence that it provided reasonable and appropriate efforts to assist him in remedying the conditions resulting in L.Y.'s foster care placement.

Code § 16.1-283 embodies "[t]he statutory scheme for the . . . termination of residual parental rights in this Commonwealth." Rader v. Montgomery Cty. Dep't of Soc. Servs., 5 Va. App. 523, 526, 365 S.E.2d 234, 235 (1988). This "scheme provides detailed procedures designed to protect the rights of the parents and their child," balancing their interests while seeking to preserve the family. Id. at 526, 365 S.E.2d at 235-36; see also Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 539, 394 S.E.2d 492, 494 (1990). However, we have consistently held that "[t]he child's best interest is the paramount concern." Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 827, 433 S.E.2d 500, 503 (1993) (citing Code § 16.1-283).

Here, the circuit court terminated Yafi's parental rights pursuant to both Code § 16.1-283(E)(iii) and 16.1-283(E)(iv). Specifically, the statute states that a parent's parental rights may be terminated

> if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that . . . (iii) the parent has been convicted of an offense under the laws of the Commonwealth . . . that constitutes felony assault resulting in serious bodily injury or felony bodily wounding resulting in serious bodily injury or felony sexual assault, if the victim of the offense was a child of the parent . . . at the time of such offense; or (iv) the parent has subjected any child to aggravated circumstances.

Code § 16.1-283(E) defines "serious bodily injury" as "bodily injury that involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." Yafi, however, relies upon a different subsection, Code § 16.1-283(C)(2), to argue that the circuit court erred in terminating his residual parental rights because DSS failed to provide evidence of "reasonable and appropriate" services.

Code § 16.1-283(C)(2) states that a court may terminate parental rights if

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005).

What Yafi fails to address, however, is that his residual parental rights were terminated pursuant to Code § 16.1-283(E)(iii) and 16.1-283(E)(iv), not Code § 16.1-283(C)(2). It follows that Code § 16.1-283(C)(2) is not relevant to this case. Further, the plain language of the statute indicates that the termination of Yafi's residual parental rights under Code § 16.1-283(E)(iii) and 16.1-283(E)(iv) did not require a predicate showing that DSS provided any services to Yafi. Accordingly, and as noted by the circuit court, DSS was not required to make reasonable and appropriate efforts to reunite L.Y. with Yafi after his conviction for felony child abuse and because Yafi subjected L.Y. to aggravated circumstances.

## C. Sufficiency of the Evidence

In his second assignment of error, Yafi argues that the circuit court erred in terminating his residual parental rights because DSS failed to present sufficient evidence that he caused Y.Y.'s injuries. Yafi also argues that DSS failed to present sufficient evidence that termination was in L.Y.'s best interest because there was no evidence that L.Y. was a victim of abuse or neglect. Again, Yafi apparently misreads the statute.

Here, the evidence is clear that Yafi was convicted of felony child abuse resulting in serious bodily injury to Y.Y. On February 5, 2018, the circuit court entered an order accepting Yafi's guilty plea pursuant to North Carolina v. Alford, 400 U.S. 25 (1970),[4] to the charge of aggravated malicious wounding, in violation of Code § 18.2-51.2(A), and guilty plea to the charge of child neglect, in violation of Code § 18.2-371.1(B). The circuit court referenced both felony convictions before revoking Yafi's residual parental rights.

Further, viewed in the light most favorable to DSS, the record contains extensive evidence of the horrific child abuse suffered by Y.Y. at the hands of his father, Yafi. Yafi was one of Y.Y.'s primary caretakers, and it was while Y.Y. was residing with Yafi that Y.Y. sustained his injuries. Dr. Foster testified to the nature and severity of Y.Y.'s head trauma and compared the injury to one that would be suffered by an unrestrained individual involved in a "high speed motor vehicle accident[.]" Dr. Foster also testified that the crushing or splintering of Y.Y.'s T1 vertebra was clearly a non-accidental injury. She further opined that Y.Y.'s injuries "occurred on more than one occasion." As a result of his injuries, Y.Y. is permanently blind and has a permanent loss of brain tissue, which will affect his developmental milestones and cognitive function.

Yafi argues in part that his parental rights to L.Y should not have been terminated because L.Y. was not the victim of any assault or abuse. However, the facts of this case represent precisely the kind of situation Code § 16.1-283(E)(iii) is designed to address. Clearly, Yafi's convictions for aggravated malicious wounding and child neglect constitute "felony assault[s]" that resulted in

---

[4] At oral argument, counsel for Yafi argued that the fact that Yafi entered an "Alford plea" in which he denied any responsibility for Y.Y.'s injuries means that Yafi's plea and subsequent conviction is insufficient to support termination of Yafi's parental rights to L.Y. under either Code § 16.1-283(E)(iii) or 16.1-283(E)(iv). However, the legal consequences of a so-called "Alford plea" are well settled and are the same as any guilty plea. See, e.g., Carroll v. Commonwealth, 54 Va. App. 730, 747, 682 S.E.2d 92, 100 (2009) ("An Alford plea is a guilty plea in the same way that a plea of nolo contendere or no contest is a guilty plea." (citation omitted)). In any event, it is not Yafi's plea but the *conviction* resulting from his plea that is pertinent to the revocation of Yafi's parental rights pursuant to Code § 16.1-283(E)(iii).

- 14 -

"serious bodily injury or felony bodily wounding."  See Code § 16.1-283(E)(iii).  That subsection expressly permits the termination of the parental rights of any or all of a parent's children when he or she has been convicted of felony assault resulting in serious bodily injury if the victim of the offense was a child of the parent at the time of the offense.

Based upon Yafi's convictions for his felony assault on Y.Y., the circuit court did not err in terminating Yafi's residual parental rights to L.Y. pursuant to Code § 16.1-283(E)(iii).  It follows that, because the circuit court had sufficient evidence to find that termination was in L.Y.'s best interests pursuant to Code § 16.1-283(E)(iii), we need not and do not address whether the evidence that Yafi abused Y.Y. is sufficient to terminate Yafi's parental rights to L.Y. pursuant to Code § 16.1-283(E)(iv).

### III.  CONCLUSION

For the reasons discussed above, the judgment of the circuit court is affirmed.

Affirmed.