COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges O'Brien, AtLee and Senior Judge Clements
Argued by videoconference


SELENA GARIBALDI

v.      Record No. 1113-21-4

FAUQUIER COUNTY DEPARTMENT OF
  SOCIAL SERVICES

SELENA GARIBALDI
                                                MEMORANDUM OPINION* BY
v.      Record No. 1374-21-4                    JUDGE JEAN HARRISON CLEMENTS
                                                MAY 24, 2022
FAUQUIER COUNTY DEPARTMENT OF
  SOCIAL SERVICES

SELENA GARIBALDI

v.      Record No. 1375-21-4

FAUQUIER COUNTY DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF FAUQUIER COUNTY
James P. Fisher, Judge

Peter Thomas Hansen (Pierce R. S. Hansen; Peter Thomas Hansen,
P.C., on briefs), for appellant.

Kara Larson; Alexander E. Morgan, Guardian *ad litem* for the minor
children (Robert F. Beard; Kara L. Larson, PLLC; Hartsoe &
Morgan, P.L.L.C.; Robert F. Beard, PLC, on brief), for appellee.


Selena Garibaldi (mother) appeals the circuit court orders terminating her parental rights to

her three children and approving the foster care goals of adoption. Mother argues that the circuit

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

court erred in terminating her parental rights and finding that without good cause, she was "unwilling or unable within a reasonable period of time to remedy the conditions that led to [the children's] foster care placement." She further asserts that the circuit court erred in finding that it was in the children's "best interests to be placed for adoption, and to terminate [her] parental rights." Lastly, mother contends that the circuit court "erred in refusing to enter a transitional foster plan that would have enabled [her] additional time to achieve the permanency plan goals that the Department of Social Services had established with respect to the children." We find no error and affirm the decision of the circuit court.

## BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Here, the Department was the prevailing party.

Mother is the biological parent to A.F., E.J.C., and E.M.C., who were ages eight, three, and two at the time of the circuit court hearing.[2] Before moving to Virginia, mother and A.F. had lived in Texas. The Fauquier County Department of Social Services (the Department) first became involved with the family in 2014, after a representative from Texas requested that the

---

[1] The record in these cases was sealed. Nevertheless, the appeals necessitate unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[2] The children have different biological fathers, whose parental rights also were terminated.

- 2 -

Department follow up with the family to ensure that mother had obtained medical care for A.F., who had been diagnosed with congenital hypothyroidism.[3]

In 2017, the Department again became involved with the family after mother was incarcerated. Robert Cooper, mother's paramour, was watching A.F. and E.J.C., and there were concerns about his ability to care for the two children.[4] Once mother was released from incarceration, the Department arranged for an intensive therapeutic parenting coach to assist the family, but mother and Cooper did not follow through with services. Shortly thereafter, the Department referred mother to a domestic violence program because she reported that Cooper was physically violent with her. Mother, however, did not follow up with the program. A couple of months later, the Department received a report that mother and Cooper were using illegal drugs. Mother tested positive for marijuana, and Cooper tested positive for cocaine, marijuana, and benzodiazepines.

Thereafter, the family was evicted from their home and moved to several different hotels and motels; mother did not always notify the Department of their location. The Department lost contact with the family in the spring of 2018. On November 28, 2018, the family sought assistance from the Department, as they were again facing eviction. Mother reported that she was pregnant and intended to move to Texas after their court hearing on the eviction.

On December 13, 2018, the Department learned that mother and Cooper had been arrested.[5] Mother had arranged for the children to stay with a friend, but the friend informed the Department that she could not care for them. In addition, the Department discovered that A.F.

---

[3] A.F. had been in foster care in Texas due to medical neglect but later was returned to mother's custody. Mother and A.F. subsequently moved to Virginia.

[4] Cooper was determined not to be the biological father of E.J.C., but he is the biological father of E.M.C.

[5] Mother was charged with assaulting a police officer.

had not been attending school regularly, and mother had failed to attend scheduled school meetings or return phone calls. Considering mother's incarceration, the lack of available caregivers, and the Department's concern for the children's well-being, the Department petitioned to remove the children from mother's care and place them in foster care.

The Fauquier County Juvenile and Domestic Relations District Court (the JDR court) entered emergency and preliminary removal orders for A.F. and E.J.C. The JDR court adjudicated that A.F. and E.J.C. were neglected, based on a stipulation between mother and the Department. The JDR court subsequently entered dispositional orders, which mother did not appeal.

Approximately a month and a half after A.F. and E.J.C. entered foster care, mother gave birth to E.M.C. The Department immediately requested emergency custody of E.M.C. The JDR court entered emergency and preliminary removal orders for E.M.C. The JDR court adjudicated that E.M.C. was at risk of being abused or neglected. The JDR court subsequently entered a dispositional order, which mother did not appeal.

When the children entered foster care, the Department required mother to meet certain goals before reunification could be achieved. The Department required mother to complete a substance abuse evaluation and follow through with all recommended treatment.[6] In addition, the Department required mother to participate in a psychological evaluation and follow through with all recommendations. The Department expected mother to demonstrate that she had "the mental health capacity to appropriately parent and care for the children." The Department required mother to participate in weekly counseling sessions with Jamie Austin, a professional counselor and certified trauma cognitive behavioral therapist.

---

[6] Mother completed the substance abuse evaluation, and no services were recommended. Mother was randomly tested for drugs on three occasions and tested negative for "all substances" each time. Mother claimed that she was "clean and sober" at the circuit court hearing.

Mother also had to obtain and maintain safe and stable housing for a period of at least six months. In addition, mother had to obtain and maintain stable employment so that she could demonstrate the ability to provide financially for herself and the children. Furthermore, mother had to maintain contact with the Department and consistently visit with the children.

Initially, mother complied with some of the Department's requirements. For example, she regularly visited with the children, maintained contact with the social worker, and participated in weekly individual counseling sessions. The Department met with mother and Cooper to provide them with information on housing options. Nevertheless, mother and Cooper continued to "bounce[] around" from various motels, friends, and relatives. The Department wanted mother to establish a "permanent living situation."

In April 2019, mother was incarcerated for approximately six weeks for assaulting a police officer, which was the criminal charge that led to A.F. and E.J.C.'s placement in foster care. After mother was released from jail, she did not resume her individual counseling with Austin, even though Austin had kept mother's appointment open for her during and after her incarceration. Mother, however, completed a neuropsychological evaluation with Dr. Edwin Carter, a licensed clinical psychologist. Dr. Carter diagnosed mother with post-traumatic stress disorder, anxiety disorder, low self-esteem, impulsive disorder, bipolar disorder-depressed-mild, and cognitive communication deficit. Dr. Carter opined that mother had "significant learning disabilities" and "lack[ed] cognitive skills and the emotional stability necessary to effectively parent children." He questioned whether mother could "take care of herself—much less any children" because of her "cognitive problems." Dr. Carter doubted that mother could "independently parent her children," even with help.

Despite Dr. Carter's conclusions, the Department provided mother with supervised visitation for all three children. E.J.C. and E.M.C. often did "very well" during the visits.

Conversely, A.F. had some "behavioral issues," such as throwing tantrums, screaming, and crying if she did not get her way. Mother became "frustrated" and sometimes had difficulty meeting the needs of all three children. The visitation supervisor tried to help mother establish boundaries and follow through with the boundaries. Mother never progressed to unsupervised visits.

In October 2019, the Department petitioned for the termination of mother's parental rights to the children because she had not demonstrated that she could provide a "safe, stable, and nurturing environment in which they [could] thrive." At the time, mother still had not resumed her counseling and had not obtained stable housing. In addition, mother had failed to maintain stable employment. The JDR court terminated mother's parental rights and approved the foster care goals of adoption. Mother appealed the JDR court's rulings.

On May 3 and 4, 2021, the parties appeared before the circuit court. The Department presented evidence that A.F. required daily medication for her hypothyroidism, which her endocrinologist monitored. Due to her condition, A.F.'s diet had to be monitored closely, and she had to be encouraged to be active. In addition, A.F. had begun participating in weekly outpatient therapy. A.F.'s therapist diagnosed her with post-traumatic stress disorder and determined that she had a "lot of developmental delays." Initially, A.F. was "highly unstable" and displayed "a lot of erratic behavior." The therapist explained that A.F. needed a caregiver who could not only meet A.F.'s serious medical needs, but also her "social-emotional needs." The therapist testified that A.F. was "doing very well in school" and "flourishing in her foster home." The therapist opined that removing A.F. from her foster home "would be sending her back to pre-therapy level of functioning."

The Department also presented evidence that mother had been uncooperative with counseling. Mother had worked with Austin from November 2017 until February 2018, and

from January 2019 until April 2019. Mother was discharged from counseling, however, due to non-compliance despite her need for ongoing therapy. Austin explained that mother had a "very, very significant trauma history, a very complex trauma history." They had been working on mother's understanding of how her own trauma impacted her and the children. Austin explained that mother was unable to "recognize her own emotional needs, safety, and security" and was "not in a position" to effectively parent a child with trauma. Austin doubted that mother was "in a place where she was ready and able to do the hard work that need[ed] to be done in order for her to be safe and to learn how to keep small children safe."

The Department believed that mother and Cooper had had "many ups and downs in their relationship during this foster care case," and they admitted that their relationship was "not the healthiest." At the circuit court hearing, mother testified that she was no longer in a relationship with Cooper and had no plans to resume living with him. In the fall of 2020, mother claimed that she and Cooper got into a physical altercation, so she obtained a one-year protective order against him.

Mother and Cooper had been living together in Warrenton. At the time of the circuit court hearing, the Department was unaware of mother's address or what her living situation was. Mother testified that in September 2020, she had moved to Danville and lived in a hotel for two weeks. She then moved to another hotel, which was where she was living at the time of the circuit court hearing. Mother also claimed to be applying for housing with "different realtor companies."[7] Mother admitted that her current living situation, which was a one bedroom, was not suitable for the children, but she testified that she could get a two bedroom for all of them.

The Department also was unaware of mother's employment situation or whether she was in counseling. Mother testified that she was diagnosed with COVID in August 2020 and that she

_____

[7] Mother had been denied public housing because of her "background check."

lost her job and stopped counseling during that time. At the time of the circuit court hearing, however, mother was working for a temporary agency and part-time at Taco Bell. Mother further claimed that she was in weekly counseling with a new counselor. Mother explained that she stopped seeing Austin because she felt that she was not "being heard." Mother informed the circuit court that she was scheduled to start parenting classes the following week. Since the children entered foster care, mother had obtained her driver's license and a vehicle.

After hearing the evidence and arguments, the circuit court found that mother's living situation was "profoundly unstable," and it expressed concerns about her mental health. The circuit court further found that mother was not "equipped to provide the children day-to-day nurturing and the care that they need and deserve." Thus, the circuit court terminated mother's parental rights to the children under Code § 16.1-283(C)(2) and approved the foster care goals of adoption. These appeals followed.

ANALYSIS

Termination of parental rights

Mother challenges the circuit court's ruling terminating her parental rights to the children. "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)).

Mother argues that the evidence was insufficient to prove that she was unwilling or unable, within a reasonable period of time, to remedy the conditions that led to the children's placement in foster care. She further asserts that it was not in the children's best interests to terminate her parental rights or "be placed for adoption." Mother contends that termination was inappropriate because the Department presented no evidence of ongoing drug use, "dangerous" living conditions, physical or sexual abuse, or ongoing and "dangerous" mental illness.

"'[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by' the United States Supreme Court." *Geouge v. Traylor*, 68 Va. App. 343, 368 (2017) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)). This Court has recognized that the termination of parental rights is a "grave, drastic and irreversible action." *Bristol Dep't of Soc. Servs. v. Welch*, 64 Va. App. 34, 44 (2014) (quoting *Helen W. v. Fairfax County Dept. of Human Dev.*, 12 Va. App. 877, 883 (1991)).

"Code § 16.1-283 embodies '[t]he statutory scheme for the . . . termination of residual parental rights in this Commonwealth.'" *Yafi*, 69 Va. App. at 551 (quoting *Rader v. Montgomery Cnty. Dep't of Soc. Servs.*, 5 Va. App. 523, 526 (1988)). "This 'scheme provides detailed procedures designed to protect the rights of the parents and their child,' balancing their interests while seeking to preserve the family." *Id.* (quoting *Rader*, 5 Va. App. at 526). The circuit court terminated mother's parental rights under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi*, 69 Va. App. at 552 (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

The circuit court acknowledged that mother undoubtedly loved the children and had made "some progress" toward meeting the Department's requirements for reunification. Yet mother was unable to remedy the conditions that led to the children's placement and continuation in foster care. One of the Department's enduring concerns throughout its involvement with the family was mother's housing situation. The circuit court found that mother's living situation was "inconsistent," "unstable," and had "not improved to any meaningful degree from the time that these children [had] been put in foster care." At the time of the circuit court hearing, mother was residing in a hotel. The circuit court recognized that "there's certainly no dishonor in living in a hotel," but mother was not prepared to house and care for the children. Mother admitted that her current room would not accommodate the children, and the circuit court noted that it "didn't even hear somebody testify that they had a hot plate." The circuit court found that mother's living environment was not "suitable" for the children.

In addition to mother's unstable housing situation, her failure to prioritize her mental health was concerning to the circuit court. After mother submitted to a neuropsychological evaluation, Dr. Carter questioned mother's ability "to effectively parent." The evidence established that mother had been diagnosed with post-traumatic stress disorder. The circuit court further found "persuasive" Austin's testimony that mother had a "very complex trauma history" that required ongoing therapy. Mother admittedly had not attended therapy consistently while the children were in foster care. The circuit court found "heartbreaking" mother's profound need for therapy but unwillingness to "follow through with her counseling." The circuit court

- 10 -

concluded that despite the services the Department offered, mother had been "unable to remedy" the conditions that led to the children's placement in foster care.

By the time of the circuit court hearing, the children had been in foster care for more than two years. E.M.C. was two years old and had spent all but a couple of days of his life in foster care. The circuit court found that E.M.C. and E.J.C. were doing well in foster care. The evidence established that A.F. was "flourishing" in her foster care placement; she was receiving proper medical and mental health treatment for her congenital hypothyroidism and post-traumatic stress disorder. The circuit court found that mother was not "equipped" to meet the children's needs.

The circuit court concluded that it could not "wait indefinitely to determine if [mother] . . . can become responsible enough to properly parent these children." "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 322 (2013) (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Accordingly, based on the totality of the circumstances, the circuit court did not err in terminating mother's parental rights to her children under Code § 16.1-283(C)(2) and finding that termination was in their best interests.

### Waiver

In her last assignment of error, mother argues that the circuit court "erred in refusing to enter a transitional foster plan that would have enabled [her] additional time to achieve the permanency plan goals that the Department of Social Services had established with respect to the children." Mother does not present any argument or authorities in support of this assignment of error in her brief; therefore, "it is waived and will not be considered on appeal." *Wroblewski v. Russell*, 63 Va. App. 468, 489 (2014); *see* Rule 5A:20(e). "'[W]hen a party's "failure to strictly adhere to the

requirements of Rule 5A:20(e) is significant," "the Court of Appeals may . . . treat a question presented as waived.""" *Id.* (quoting *Parks v. Parks*, 52 Va. App. 663, 664 (2008)). *See also Muhammad v. Commonwealth*, 269 Va. 451, 478 (2005) ("Failure to adequately brief an assignment of error is considered a waiver.").

In mother's brief, she states that "[t]he final assignment of error in this case attacks the trial court's finding that [the Department] made reasonable and appropriate services available to the parents . . . prior to the termination." Mother's final assignment of error, however, did not address reasonable and appropriate services. "Rule 5A:20(c) requires us to hold that this issue is waived because it is not part of appellant's assignment of error." *Fox v. Fox*, 61 Va. App. 185, 202 (2012). Thus, we do not consider mother's last assignment of error.

CONCLUSION

For the foregoing reasons, the circuit court's ruling to terminate mother's parental rights is affirmed.

*Affirmed.*