COURT OF APPEALS OF VIRGINIA

Present:   Judges Beales, AtLee and Malveaux
Argued at Richmond, Virginia

BELYNDA HILTON

v.      Record No. 0379-23-2

KING AND QUEEN COUNTY
 DEPARTMENT OF SOCIAL SERVICES

MEMORANDUM OPINION[*] BY
JUDGE RANDOLPH A. BEALES
JUNE 11, 2024

FROM THE CIRCUIT COURT OF KING AND QUEEN COUNTY
B. Elliott Bondurant, Judge

Deborah S. Goodwin (Akers & Cleator Law Group, P.L.L.C., on
brief), for appellant.

Julie Churchill (Carla Blake Hook; Louise Moore, Guardian ad litem
for the minor children; The Law Office of Carla B. Hook; Louise A.
Moore, Esquire LLC, on brief), for appellee.


Belynda Hilton ("mother") appeals the Circuit Court of King and Queen County's orders

terminating her parental rights to her children, J.F. and I.A.[1]  Mother argues that the circuit court

erred in finding that the King and Queen County Department of Social Services (the "Department")

presented clear and convincing evidence to support the termination of her parental rights under

Code § 16.1-283(B) and Code § 16.1-283(C)(2) and that the termination was in the best interests of

the children.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] We use initials for the children to protect their privacy.

# I. BACKGROUND[2]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).

Mother and Timothy Adkins ("father") are the biological parents of I.A. Mother is also the biological parent of J.F. and P.G., who are not father's biological children. Mother has a fourth child, B.G., who is in the custody of mother's stepfather. Father has four other children, but he has had limited contact with them. Father has also appealed the circuit court's judgment to terminate his parental rights to I.A. *See Adkins v. King & Queen Cnty. Dep't of Soc. Servs.*, No. 0354-23-2 (Va. Ct. App. June 11, 2024).

The Department has been involved with the family since at least 2017 for allegations of physical neglect and abuse. Angela Land, a case worker with the Department who was familiar with the family but was not formally assigned to the case until June 2022, testified at the circuit court's termination hearing that in December 2019, I.A. was born substance-exposed, and mother tested positive for marijuana. In November 2020, the Department received a report from school officials that J.F. "was lethargic, he had a low pulse rate, and that his respiratory [rate] was low." Mother claimed that J.F. "had not been sleeping at night and on that particular night she gave him 6 milligrams of melatonin to help him sleep," which resulted in J.F.'s hospitalization.

Shannon Mitchell, a case worker with the Department who was assigned to the family from February 2021 to November 2021, testified that in February 2021, mother, father, J.F., and

---

[2] Although the record in this case was sealed, "this appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only those portions of the record that contain the facts mentioned in this opinion; the rest of the record remains sealed. *Id.*

I.A. lived in a home at "the top of the hill," while mother's sister (Crystal Hilton), Crystal's boyfriend, and P.G. lived in a home on the same property at the "bottom of the hill." The Department intervened that same month after receiving reports that mother "was using Percocet heavily and had been observed speaking to [J.F.] in a very negative way and yelling at him." When the Department went to visit mother's home the next day, it learned that mother was at a hospital in Richmond with P.G., who "had overdosed the previous night" after attempting to commit suicide by "taking a whole bunch of pills." When the hospital released P.G., it provided mother with contact information for counseling services and instructions regarding P.G.'s supervision and care, including removing all weapons from the home.

After P.G.'s release from the hospital, mother allowed her son to return to Crystal's home rather than to stay with mother, despite her knowing that Crystal used drugs and that Crystal's boyfriend had pending drug charges. On February 20, 2021, about a week after his release from the hospital, P.G. committed suicide by using a firearm. He left a note stating that "he was tired of the drugs, the hate, and the fighting." Adkins was incarcerated at the time that P.G. committed suicide.

Mother told the Department that she "was unaware of where [P.G.] had gotten the firearm or where he had gained access to it and that she didn't know that he had any plans to harm himself." She thought that the gun might have belonged to her brother, who had previously brought a handgun into Crystal's home that subsequently could not be located although the brother did not ever report the gun as missing or stolen. Mother admitted to the Department that she "was using Percocet that was not prescribed to her, that it was provided to her by an ex-boyfriend who resided in Gloucester and that she was using it to address the pain of having a recent miscarriage." Mother also told the Department that she

> smoked marijuana on a daily basis because it helped with her
> anxiety and that she was honest with her children about her use of

- 3 -

marijuana but she didn't do that in front of them, that she would send the children away if she were smoking marijuana if they attempted to be around her when she was smoking.

Several days later, the Department returned to mother's home and met with father, who "had recently been bonded from jail and was in the home." Father told the Department that he believed that the gun P.G. had used to commit suicide had belonged to mother's brother, who father claimed was a felon on the North Carolina sex offender registry and was selling drugs out of Crystal's home. Father reported that mother and P.G. "did not have a good relationship" and that P.G. "had no respect for his mother because of the things that she had said and done to him." Father was concerned about mother's drug use and "the way that she spoke to the children" because he claimed that she had called them derogatory names, which mother denied. Father admitted to having a "little problem with meth" and that he had been arrested for driving under the influence in December 2020.

Following its investigation, the Department made "Level 1 findings for physical neglect, lack of supervision" against mother for J.F., I.A., and P.G. The Department petitioned to remove J.F. and I.A. from mother's home, and the children entered foster care on February 26, 2021. The King and Queen County Juvenile and Domestic Relations District Court (the "JDR court") adjudicated that J.F. and I.A. were abused or neglected, and it entered dispositional orders.

After the children entered foster care, the Department established certain requirements that mother had to meet before she could be reunited with her children. The requirements included that "she was responsible for maintaining sobriety and abstaining from any illegal substances, to include those that were not prescribed to her"; she "was responsible for attending, participating, and following all recommendations of substance use assessment"; she "was responsible for attending and participating in and following all recommendations of a mental health assessment and individual counseling appointments, developing coping skills and

- 4 -

demonstrating them"; she was "responsible for attending appointments, completing and following through with all recommendations of the parental capacity evaluation"; she "was responsible for participating in parent coaching sessions, attending and participating in visitation, parenting time appointments, and demonstrating appropriate behavior during visits"; she was "responsible for maintaining a safe and stable and appropriate home for the children"; and "she was responsible for obtaining employment and demonstrating the ability to provide for the children."

Mother completed a parental capacity evaluation. The evaluators found that mother was generally uncooperative and that she was "emotionally dysregulated, and her moods were unpredictable." The evaluators expressed significant concerns about mother's "ability to keep her children safe and meet their needs," and they determined that mother "needs substantial treatment and support to develop the emotional regulation and parenting skills necessary to properly care for her children." They also expressed concerns about mother's volatility, her violent tendencies, her frequent name calling and yelling, her drug use, and her domestic violence and abuse. The evaluators recommended that mother "participate in an intensive outpatient substance abuse program" and, if unsuccessful, then enter inpatient treatment. They also recommended that mother participate in a psychological evaluation, an individualized parenting program, individual counseling, a medication evaluation, and either co-parenting counseling or couples counseling with father.

Mother did not complete an approved individualized parenting program, co-parenting counseling, or mental health assessment. However, mother did complete several programs through Healthy Families, including classes on "Guiding Positive Behavior" and "Healthy Relationships and Communication," as well as "Weekly Video Chat Groups." She also attended

individual trauma counseling sessions through the Middle Peninsula Northern Neck Community Services Board.

Beginning in March 2021, the Department referred mother to the Community Services Board for a substance abuse assessment and treatment. Although mother completed the intake process, she only attended one session. The JDR court ordered mother to participate in inpatient treatment, but mother never attended a program.

In late June 2022, mother tested positive for amphetamines, codeine, cannabis, methamphetamine, and oxycodone. Mother denied using methamphetamine, and she claimed that she only tested positive for that substance because she had touched dollar bills at her job at a 7-Eleven convenience store. She also claimed that she had tested positive for some of the other drugs because she had undergone recent medical procedures. However, mother never provided the Department with proof of those medical procedures. In October 2022, mother again tested positive for opiates, oxycodone, and cannabis.

In addition to the other services that the Department provided, the Department offered supervised visitation to mother and father, both of whom regularly attended visitation and acted appropriately with the children. The Department reported that the children were happy and enjoyed visiting with mother and father.

While the children were in foster care, the Department was unable to find viable relative placements for the children. The Department requested through the Interstate Compact on the Placement of Children ("ICPC") that the Department of Social Services in North Carolina investigate the home of mother's cousin, but it did not approve the placement following its investigation. The Department declined to further pursue that possible placement. In September 2022, the Department met with mother and father to discuss other possible relative placements. Mother "was adamant that she was going to get her boys back," and she maintained that she had

only tested positive for drugs because she had touched dollar bills at her workplace and had undergone recent medical procedures. Mother provided the Department with contact information for her aunt who lived out-of-state and the Department requested a home study through the ICPC, but the results were not available at the time of the circuit court's termination hearing. Mother's sister, Crystal, died while the children were in foster care. Father, on the other hand, conceded that "he was just not ready to take custody of [I.A.]," but he noted at the time that he was then planning to go to an inpatient substance abuse treatment program. Father suggested his adult son as a possible placement, but his adult son did not respond to the Department's calls, and he did not contact the Department. A week or two after the meeting, father admitted that "he had messed up" by using drugs, but he reiterated his intention to go to an inpatient treatment facility.

After mother failed to complete the Department's requirements, the Department petitioned the JDR court to terminate mother's parental rights to J.F. and I.A. On October 28, 2022, the JDR court terminated mother's parental rights to J.F. and I.A. Mother appealed the JDR court's rulings to the circuit court.

At the circuit court's termination hearing, the Department presented evidence that J.F. and I.A. live in the same foster home together and that they have a close relationship. The Department reported that J.F., who was then 11 years old, had been having "a lot of disruptive behaviors" at his school. While in foster care, J.F. participated in outpatient and in-home therapy, he saw a psychiatrist, and he took medication. The Department also reported that I.A., who was then three years old, was "doing well in the foster home," but he had been exhibiting some "forms of aggression." I.A. participated in speech therapy, which "has tremendously improved his speech."

The Department explained that it had difficulty working with mother because she was "unwilling to focus on the needs and truly to engage with the services." Mother told the Department that "she could counsel herself" and that "she was unwilling to do any of the services." The Department noted that mother and father separated and reunited several times while the children were in foster care.

Mother testified that she lived alone in the same home from which the children had been removed by the Department. Mother stated that her landlord was her boyfriend, who had also been Crystal's boyfriend and who continued to live in the same home as he did with Crystal and P.G. Mother was aware of her boyfriend's criminal record, which included drug charges, but she claimed that he had quit using drugs. Although mother acknowledged that she and father were romantically involved as recently as two months before the circuit court's termination hearing, she did not think that they had a healthy relationship. She admitted that she and father were physically violent with one another, sometimes in front of the children, but she claimed that they had improved their co-parenting relationship since the children entered foster care.

Mother further testified that she started using marijuana when she was nine years old, but that she had stopped one month before the circuit court's termination hearing. She stated that she last used Percocet sometime after the JDR court's termination hearing. She admitted to trying methamphetamine, spice, bath salts, and Vicodin. Despite her substance abuse history, mother maintained that she did not need treatment, but she had attended Alcoholics Anonymous and Narcotics Anonymous meetings. Mother's counselor had tried to help mother find an inpatient program, but the counselor stopped once the JDR court terminated mother's parental rights.

In addition, mother testified that she had been participating in weekly counseling sessions at the Middle Peninsula Northern Neck Community Services Board for about 15 months and she

had found it to be helpful. Mother and her counselor, Sara Michelle Hallberg, had been working on addressing mother's trauma, her substance abuse, and stress management. Hallberg testified that when mother started therapy, "she was highly dysregulated" and she "blamed everybody around her for the things that were happening." Hallberg recommended intensive services for mother.

Mother acknowledged that she had struggled with J.F.'s behaviors before he entered foster care, including his fights at school. Although she had been working full-time at a 7-Eleven store for about seven months, mother testified that she had arranged for a different job with better hours closer to her home, and she stated that I.A. could attend daycare or the Boys & Girls Club while she was working.

Father testified that he lived in Gloucester with his nephew, his nephew's girlfriend, and their son. Father admitted that his nephew is a sex offender, that his nephew's girlfriend "uses a lot of marijuana," and that his nephew and girlfriend go to a methadone clinic. Father recognized that his living situation was "not a good environment" for I.A., but he claimed that he could move to his brother's home in Yorktown, and then into a home that was currently under construction across the street from his brother's home.

Father acknowledged that illegal drugs were present in the home when J.F. and I.A. lived with him and mother, but he claimed that neither he nor mother used drugs in front of the children. Father also acknowledged that he and mother often argued, which at times led to physical violence. Despite their turbulent history, father maintained that he and mother did not need co-parenting counseling. Father claimed that he and mother were no longer in a romantic relationship, but he admitted that he and mother engaged in sexual relations two months before the circuit court's termination hearing.

After hearing the evidence and arguments, the circuit court found that mother and father had engaged in "rampant drug use" and that "these three children initially were abused and neglected." The judge commended mother and father for "making strides in trying to get your lives back in order and on the right path," but he noted that it took father "almost a year and a half for the light bulb to come on." The circuit court was surprised that mother tested negative for drugs at the termination hearing and did not believe mother's testimony that she had previously tested positive for drugs due to handling money at her workplace. The trial judge also questioned mother's progress, stating that she was "still living in the same house just up the hill from where your son committed suicide" and that she was dating a drug user. In addition, the circuit court found that mother and father had not completed the Department's requirements despite the children having been in foster care for approximately two years. Neither mother nor father had viable plans or appropriate housing for the children. The circuit court found that neither mother nor father had substantially remedied the conditions that had led to the children's placement in foster care. On February 14, 2023, pursuant to Code § 16.1-283(B) and Code § 16.1-283(C)(2), the circuit court terminated mother's parental rights to J.F. and I.A. Mother appeals.

## II. ANALYSIS

On appeal to this Court, mother argues that the circuit court erred in terminating her parental rights under Code § 16.1-283(B) and Code § 16.1-283(C)(2) and in finding that the termination was in the best interests of J.F. and I.A.

"'On review of a trial court's decision regarding the termination of parental rights, we presume the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests."'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)).

- 10 -

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

Code § 16.1-283(B) and Code § 16.1-283(C)(2) each provide an independent ground for terminating parental rights, and they each require that the child be in foster care, that the reasons for termination be proved by clear and convincing evidence, and that the decision to terminate be in the best interests of the child. *See City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 563 (2003). Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

This Court has explained that "[s]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

Here, the Department specifically required mother to participate in and complete several services before she could be reunited with J.F. and I.A. While mother participated in counseling, she did not complete her substance abuse treatment. Mother testified that she had been using drugs since she was nine years old, and she admitted that her boyfriend was a drug user. The circuit court found that there had been "rampant drug use" in mother's home. Mother was also required to participate in parenting classes and to obtain a psychological evaluation, but she did

not complete either service. The circuit court found that mother had had ample opportunity to satisfy the Department's requirements but that she had failed to do so.

In addition, mother was required to have stable and appropriate housing, but she continued to live in the same home from which the children had been removed, and which was near the home where P.G. had committed suicide. The circuit court ultimately concluded that mother's home was not appropriate for the children. Furthermore, at the time of the circuit court's termination hearing, J.F. and I.A. had been in foster care for approximately two years, and mother was still not in a position to care for them. The circuit court explained that it could not "keep these children in limbo for another two or three years" to see if mother would complete the Department's required services. Therefore, considering the totality of the evidence in the record before this Court, we cannot say that the circuit court erred in terminating mother's parental rights under Code § 16.1-283(C)(2), and we cannot say that the circuit court erred in finding that the termination was in the best interests of J.F. and I.A.

As this Court has often stated, "[w]hen a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 574 n.9 (2018). In short, because the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2), we do not need to reach the question of whether mother's parental rights also should have been terminated under Code § 16.1-283(B).

### III. CONCLUSION

For all of the foregoing reasons, we do not disturb the circuit court's decision to terminate mother's parental rights to J.F. and I.A.

*Affirmed.*