COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, Athey and Fulton
Argued at Lexington, Virginia


WHITNEY NICOLE MABE

v.      Record No. 1170-22-3

SMYTH COUNTY DEPARTMENT
  OF SOCIAL SERVICES                          MEMORANDUM OPINION[*] BY
                                              JUDGE CLIFFORD L. ATHEY, JR.
WHITNEY NICOLE MABE                           OCTOBER 10, 2023

v.      Record No. 1179-22-3

SMYTH COUNTY DEPARTMENT
  OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF SMYTH COUNTY
Deanis L. Simmons, Judge

David B. Childers for appellant.

Katie M. DeCoster (Paul R. Cassell, Guardian ad litem for the minor
children; Sands Anderson, PC; Cassell & Crewe, P.C., on brief), for
appellee.


Whitney Nicole Mabe ("mother") appeals from the orders entered in the Circuit Court of

Smyth County ("circuit court") terminating mother's parental rights to her children, N.C. and H.C.,

pursuant to Code § 16.1-283(C)(2).[1]  Mother contends, on appeal, that the circuit court erred by

terminating her parental rights when the Smyth County Department of Social Services ("the

Department") failed to provide her with reasonable and appropriate services for housing and

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] While the children were in foster care, mother gave birth to another child who is not the
subject of this appeal.  The JDR court accepted N.C. and H.C.'s biological father's permanent
entrustment to the Department and terminated his parental rights.

counseling. She also challenges the circuit court's finding concerning her "substance abuse issues," which she claims to have overcome. Finally, mother argues that the circuit court abused its discretion by permitting an expert witness to testify about "the ultimate issue in this matter, which was whether the child should be removed from her foster placement and placed with a different caretaker, i.e. the child's mother." Since we find no error, we affirm the circuit court's judgment.

## I. BACKGROUND[2]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)). The Department first became involved with the family in 2018, when mother lost her housing, and the Department helped her with accommodations and transportation services. In January 2019, mother entered a safety plan with the Department and agreed to place N.C. and H.C., who were two years old and nine months old, respectively, with family friends. Mother was incarcerated at the time and chose the children's caregivers. Approximately one year later, mother was visiting the children and learned that, allegedly, one of the caregivers had sexually abused the then-three-year-old N.C. Mother reported the incident to the Department and requested the removal of the children from her chosen caregivers. The Department entered a safety plan with mother and returned the children to her care.

Approximately one month later, on March 5, 2020, the Department made an unannounced home visit and tested mother for drugs. Mother tested positive for methamphetamine, amphetamine, and marijuana, but only admitted to using marijuana. The

---

[2] The record in this case was sealed. "To the extent that we mention facts found only in the sealed record, we unseal those specific facts, finding them relevant to our decision." *Daily Press, LLC v. Commonwealth*, 301 Va. 384, 393 n.1 (2022). "The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

Department later learned that the police "performed a Fourth Amendment waiver search" and discovered "mushrooms and marijuana" in mother's home within reach of the children. When confronted by the Department, mother suggested the children be placed with her requested caregivers[3]; the Department agreed with this plan and so placed the children. After a few days, mother's suggested caregivers "could not handle" N.C.'s behaviors. With no other placement options, the Department placed the children in foster care.

In March of 2020, the Smyth County Juvenile and Domestic Relations District Court (the "JDR court") entered emergency and preliminary removal orders. The JDR court adjudicated the children abused or neglected and subsequently entered dispositional orders. After the children entered foster care, the Department established requirements mother had to complete before she could be reunited with them. The Department referred mother for a psychological evaluation, Project LINK,[4] and case management services. The Department also required mother to obtain and maintain stable housing and employment, submit to random drug screens, and participate in visitation.

Mother completed the psychological evaluation, participated in the drug screens, and enrolled in Project LINK. However, between June 2020 and March 2021, mother tested positive for marijuana seven times, including while she was pregnant with her third child.[5] The Department warned mother that if her third child was born substance-exposed, the hospital

---

[3] These were different caregivers than the caregivers who were reported for the alleged sexual abuse.

[4] Project LINK provides support for parents and offers parenting classes and substance abuse classes. It does not offer specific classes or counseling for parents of children who have suffered sexual abuse.

[5] After March 17, 2021, mother tested negative for THC, but her tests revealed a low creatine level, which, according to the Department, usually means that the specimen was "skewed."

would notify the Department and the child could be removed from her custody. After testing positive in March 2021, mother told the Department that she was "no longer smoking marijuana" and "trying to get it out of her system." To her credit, ten days after her third child was born, in mid-April 2021, mother tested negative for drugs, and the Department acknowledged that mother had "worked very hard on overcoming her substance abuse." The Department further explained that although marijuana use was legal at the time of the circuit court hearing, it considered marijuana use like alcohol use when determining "how it impacts the ability to provide proper care."

In addition to participating in the drug screens, in August of 2020, mother also started the required services with Project LINK. Since a participant typically completes the Project LINK services in approximately six months, the Department anticipated that mother would complete the services by February or March 2021. However, mother's attendance at the beginning of the program was "not great." Thus, after missing 56 appointments, mother finally completed the Project LINK services in September 2021.

The Department also required mother to participate in visitation with the children. Beginning on June 9, 2020, after mother's release from incarceration, the Department scheduled 43 visits for mother, but she only attended 24. Due to the COVID-19 pandemic, mother's visits were initially virtual, until they could be conducted safely in person. The Department offered 19 in-person visits, of which mother attended 14.[6] Although mother was permitted to continue visiting with H.C., the Department stopped mother's visits with N.C. in November 2020 because of a deterioration in N.C.'s "behaviors" following her visits. For example, N.C. pulled her pants down at school and masturbated. In addition, N.C. had "night terrors" and frequent bed-wetting; she also hid and hoarded food. She became aggressive at school and pushed other children.

---

[6] Mother was late to four of the scheduled visits.

On May 11, 2021, the Department petitioned to terminate mother's parental rights because of a lack of progress in remedying the conditions requiring foster care. After several continuances, the JDR court terminated mother's parental rights to N.C. and H.C. and approved the foster care goal of adoption. Mother appealed the JDR court's orders terminating her parental rights to the circuit court for a de novo trial.

At trial, the Department presented evidence regarding the children's well-being. At the time of the circuit court hearing, five-year-old N.C. and three-year-old H.C. had been in foster care for more than two years. N.C. was living with a cousin, while H.C. was living with a foster family.[7] Due to concerns about N.C.'s exposure to trauma and possible symptoms of attention deficit hyperactivity disorder ("ADHD"), the Department referred N.C. for a psychological evaluation. The evaluator diagnosed N.C. with "moderate" ADHD and post-traumatic stress disorder ("PTSD") with dissociative features. The evaluator further opined that N.C. appeared "to be a very sexualized child" and her "sexual behaviors [were] consistent" with those seen in children with sexual abuse histories and were "not developmentally normal." Among the evaluator's recommendations was a referral to a psychotherapist who was experienced in treating young children with PTSD.

Following the psychological evaluation, N.C. began weekly therapy with Sarah Spinner ("Spinner"), a mental health counselor and social worker. N.C. reported being sexually abused by one of mother's friends and expressed anger that mother "did not take care of her."[8] Spinner, an expert in counseling children who have been exposed to trauma, testified that N.C. was "physically distraught" and "expressed feeling sad" when discussing the incident. Spinner

---

[7] The Department had to separate the children after they entered foster care because N.C. had become "too aggressive" toward H.C.

[8] N.C. also alleged that mother was present during the abuse.

explained that it was "ideal to process things individually before family therapy." According to Spinner, N.C. was still "work[ing] through" her trauma at the time of the circuit court hearing and was "not ready" to participate in family counseling with mother.

The Department presented evidence that since entering foster care and ending visitation with mother, N.C. had stopped wetting her bed at night and hoarding food. N.C.'s physical aggression and masturbation were "no longer" concerns. N.C., however, still had nightmares, which Spinner explained was a "common symptom of PTSD." The foster parents had to be diligent because things such as a television show or a familiar smell or face could "trigger" N.C. Spinner testified that N.C. was progressing and mother was "not as severe a trigger" as she had been in the earlier counseling sessions.

The Department asked Spinner whether it would "be detrimental" to N.C. to remove her from her foster home and place her "with other caregivers." Mother objected, arguing that Spinner's answer would implicate "the ultimate issue," namely "whether the child should be removed from foster care and placed back with her mom." The circuit court overruled the objection because the question focused on the impact on N.C. of being removed from foster care and placed "in another situation," not "back with her mom." Spinner opined that N.C. still had nightmares about being removed from her foster home, which required more "exploration" in therapy. Despite N.C.'s initial challenges, N.C.'s foster mother testified that N.C. had made "significant progress" and was "thriving" in her home.

Meanwhile, H.C. had started "having some of the similar issues that [N.C.] had at the age of four years old relative to PTSD." N.C. reported that H.C. had been sexually abused, and N.C. felt "guilt[y]" for not protecting her. The Department referred H.C. to individual counseling and occupational therapy. The circuit court heard evidence that H.C. had "formed an attachment" to her foster mother and was "doing well" in her foster home.

At the time of the circuit court hearing, mother was employed and living with her boyfriend, Eric Blevins ("Blevins"), and their infant child. Blevins' two sons from a previous relationship visited at least every other weekend. Initially, when N.C. and H.C. entered foster care, mother did not have a stable housing situation; she lived out of a vehicle and in the loft of a barn. Later, mother and Blevins moved into a motel and stayed there for a "couple of months" after the birth of their child.

In early 2021, the Department referred mother to the Mount Rogers Community Service Board, and she signed up with the Supportive Housing Assistance Program, which offered her a one-bedroom apartment. Although the Department "could have made that work" for mother and her children, mother refused the apartment because it could not accommodate her, Blevins, his children, and her children. After talking with Blevins, mother changed her mind and tried to secure the one-bedroom apartment but was told that she did not qualify for it because she was pregnant and trying to get her children back.

In April 2021, mother and Blevins were given a two-bedroom, one-and-one-half-bath mobile home. At the time, the home was "not livable," but mother and Blevins worked "diligently" on repairing the home. Blevins rewired the home and obtained a new breaker box, so the home had electricity. They also had to install new water lines, add a new bathtub, replace flooring, and patch the roof. Once they made these repairs, they moved into the home, which was where they were living at the time of the circuit court hearing. Mother was "very proud" of the improvements and how much they had accomplished "on their own." Mother did not ask for any assistance with repairing the home, which the Department was unable to offer in any event; nevertheless, mother was again offered alternative housing options. Mother thought "it would be more hassle and it would be harder just to get everything moved over to another place."

The Department visited mother's home a month before the circuit court hearing and found that the bedroom for N.C. and H.C. was not ready for them because it had no beds and still had some "random" items in it. Despite the progress made on repairs to the home, additional work was needed. For example, mother and Blevins were in the process of building a third bedroom for Blevins' children, and they had not repaired the inside of the ceiling. The Department was concerned that N.C.'s asthma could be triggered by "the old water damage" and "mold and stuff from the ceiling." In addition, the home was cluttered with "a lot of possessions" on the floor, as well as tools, equipment, and other debris strewn throughout the home. The children's guardian ad litem presented photographs of mother's home.

Considering mother's intention for N.C. and H.C. to live with her and Blevins, the Department conducted a background check on Blevins and determined that he was "not eligible" as a household member because he had a probation violation for a felony offense.[9] The Department also interviewed Blevins, who admitted to smoking marijuana "his whole life to help with his anxiety." At one point, Blevins and mother had a marijuana plant growing outside of their home. After the Department "discussed it with them," they removed the plant. On March 25, 2022, the Department conducted a drug test on mother, at her request. There was a "faint line for THC," and mother admitted to smoking "Delta-8 through a vape pen."

At the conclusion of the Department's evidence, mother moved to strike, which the circuit court denied. Then, mother addressed her substance abuse history and testified that she had started smoking marijuana when she was 15 years old. She also admitted to using methamphetamine and being arrested in January 2019. Mother claimed she was "completely clean" at trial and dismissed her use of Delta-8 because it was a "CBD that has been processed."

---

[9] The Department stipulated that the show cause arose out of Blevins' failure to pay a fine and restitution.

Mother testified that she wanted N.C. and H.C. returned to her custody. Acknowledging the importance of counseling, mother assured the circuit court that she would take the children to counseling. In addition, mother told the Department that she was "more than willing" to participate in counseling with N.C. but claimed that the Department had never offered it. Although mother wanted the children returned to her custody, she admitted that the children's bedroom was not ready and she would not be able to have custody of them until "the trailer is done."

At the conclusion of all the evidence, mother renewed her motion to strike, which the circuit court denied. After hearing the parties' closing arguments, the circuit court took the matter under advisement and subsequently issued a letter opinion. The circuit court found that mother "did not timely or persistently work with the services offered." In addition, the circuit court considered mother's choices of continuing to smoke marijuana, delaying her participation in Project LINK, and living in a home that was not suitable for N.C. and H.C. as examples of her "not prioritizing" the children. The circuit court found that it was in the children's best interests to terminate mother's parental rights under Code § 16.1-283(C)(2). Mother appealed.

II. ANALYSIS

A. *Standard of Review*

"'On review of a trial court's decision regarding the termination of parental rights, we presume the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests."'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v.*

*Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

"The decision whether to admit expert testimony rests within the sound discretion of the trial judge, and therefore we will not reverse unless the trial court abused its discretion." *Farrell*, 59 Va. App. at 429.

B. *The circuit court did not abuse its discretion in terminating mother's parental rights.*

Mother argues that the evidence was insufficient to support the termination of her parental rights. She contends that the Department failed to provide her with services to address her housing instability and the children's psychological issues. She further asserts that the circuit court incorrectly found that she had not "overcome" her substance abuse. For the following reasons, we disagree with these arguments.

The circuit court terminated mother's parental rights under Code § 16.1-283(C)(2), which authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). As this Court has interpreted Code § 16.1-283(C)(2), "'[r]easonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." *Harrison v.*

- 10 -

*Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 338-39 (1992)).

Mother contends that the Department did not provide her with the necessary services to remedy the conditions that required the children's continued placement in foster care. Mother's lack of a stable housing situation was one of the "conditions which led to or required continuation of the child's foster care placement." Code § 16.1-283(C)(2). Here, the circuit court disagreed with mother's contention that the Department did "nothing" to help her with housing or to rehabilitate her relationship with N.C. The record reflects that in early 2021, the Department referred mother to the Supportive Housing Assistance Program and offered her a one-bedroom apartment, which mother refused because it could not accommodate her, N.C., H.C., Blevins, his children, and their child. Later, the program offered her another housing option, but by then, mother and Blevins were repairing the home that they were living in at the time of the circuit court hearing. Mother thought it would be a "hassle" to move to another place, even though it would have been a suitable option for N.C. and H.C., unlike mother's current home. The circuit court found that "the choice she made did not prioritize N.C. and H.C."

Mother acknowledged at trial that her current home was not ready for N.C. and H.C. The circuit court found it "unreasonable to have the future and wellbeing of the subject children put on hold for a still unspecified time frame to see when this trailer might be deemed suitable habitation for the children." "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming [her] responsibilities." *Simms*, 74 Va. App. at 463 (quoting *Harrison*, 42 Va. App. at 162 (internal quotation omitted)).

- 11 -

Additionally, mother challenges the Department's failure to offer her "any type of family counseling" that could have addressed the children's psychological issues. Both N.C. and H.C. were in therapy to address their psychological needs.[10] The record reflects, however, that N.C.'s therapist opined that N.C. was still working through her trauma and was not ready for family counseling. In the meantime, the Department had referred mother to Project LINK, which offered parenting classes and counseling services, but mother did not consistently participate in the services. Therefore, the record reflects that the Department had referred mother and the children to counseling services and family counseling was not an appropriate option at the time of the circuit court hearing.

Finally, mother argued that the circuit court abused its discretion by terminating her parental rights because it expressed concern that she had not "overcome her substance abuse issues." Mother emphasizes that her last positive drug test was in March 2021. Although she had tested positive for marijuana seven times earlier, mother asserts that she had made "substantial and sustained progress."

Noting that the children entered foster care after mother tested positive for drugs and was arrested, the circuit court found that mother's seven positive drug tests, from June 2020 through March 2021, were indicative of her failure to prioritize the children and remedy the conditions that led to the children entering foster care. Code § 16.1-283(C)(2). The Department referred mother to Project LINK, which provided substance abuse counseling, but mother did not take "full advantage" of the services until months later. In addition, the circuit court questioned mother's commitment to sobriety when Blevins readily admitted that he used marijuana to control his anxiety and a marijuana plant was growing outside their home.

---

[10] N.C. was displaying sexualized and aggressive behaviors. N.C. would also regress behaviorally after visits with mother.

At the time of the circuit court hearing, the children had been in foster care for over two years. Mother admitted that her home was not ready for the children's placement. On the other hand, the children were doing well in their foster homes, and both foster families had expressed interest in adopting them. "[I]t is in the best interests of children to receive a permanent placement without languishing in the foster system." *Simms*, 74 Va. App. at 464. Considering the totality of the record, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2).

C. *The circuit court did not abuse its discretion by allowing expert testimony concerning the effects of removing N.C. from her current foster placement.*

Mother argues that the circuit court abused its discretion by allowing Spinner to testify about "the ultimate issue in this matter, which was whether the child should be removed from her current foster home and placed with a different caregiver, i.e. her mother." We disagree.

"No expert or lay witness while testifying in a civil proceeding shall be prohibited from expressing an otherwise admissible opinion or conclusion as to any matter of fact solely because that fact is the ultimate issue or critical to the resolution of the case." Code § 8.01-401.3(B).

At trial, the Department asked Spinner, "If [N.C.] were to be removed from her foster home at this point and placed with other caregivers, do you have an opinion whether that would be detrimental to her?" Mother objected to the question and argued that even though Spinner had been qualified as an expert, she could not testify as to "whether the child should be removed from foster care and placed back with her mom." The circuit court corrected mother and explained that the question was not whether N.C. should be removed from foster care and placed back with her mom, but rather whether N.C. should be removed from foster care and "placed in another situation." As an expert, Spinner could testify about N.C.'s "fear of being removed from the home." Code § 8.01-401.3. Thus, the circuit court did not err in allowing Spinner to testify about the effects of N.C. being removed from her foster home.

## III. CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*