UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Beales, AtLee and Malveaux
Argued at Richmond, Virginia


TIMOTHY ADKINS

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0354-23-2                      JUDGE RANDOLPH A. BEALES
                                                         JUNE 11, 2024

KING AND QUEEN COUNTY
  DEPARTMENT OF SOCIAL SERVICES


           FROM THE CIRCUIT COURT OF KING AND QUEEN COUNTY
                         B. Elliott Bondurant, Judge

           Charles E. Haden for appellant.

           Julie Churchill (Carla Blake Hook; Louise Moore, Guardian ad litem
           for the minor child; The Law Office of Carla B. Hook; Louise A.
           Moore, Esquire LLC, on brief), for appellee.


        Timothy Adkins ("father") appeals the Circuit Court of King and Queen County's order

terminating his parental rights to his child, I.A.[1]  Father argues that the circuit court erred in finding

that the King and Queen County Department of Social Services (the "Department") presented clear

and convincing evidence to support the termination of his parental rights under Code § 16.1-283(B)

and Code § 16.1-283(C)(2) and that the termination was in the best interests of I.A.

---

        * This opinion is not designated for publication.  *See* Code § 17.1-413(A).

        [1] We use initials for the children to protect their privacy.

# I. BACKGROUND[2]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *C. Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).

Father and Belynda Hilton ("mother") are the biological parents to I.A. Father has four other children, but he has had limited contact with them. Mother is also the biological parent to P.G. and J.F., who are not father's biological children. Mother has also appealed the circuit court's judgment to terminate her parental rights to I.A. and J.F. *See Hilton v. King & Queen Cnty. Dep't of Soc. Servs.*, No. 0379-23-2 (Va. Ct. App. June 11, 2024).

The Department has been involved with the family since at least 2017 for allegations of physical neglect and abuse. Angela Land, a case worker with the Department who was familiar with the family but was not formally assigned to the case until June 2022, testified at the circuit court's termination hearing that in December 2019, I.A. was born substance-exposed, and mother tested positive for marijuana.

Shannon Mitchell, a case worker with the Department who was assigned to the family from February 2021 to November 2021, testified that in February 2021, father, mother, J.F., and I.A. lived in a home at "the top of the hill," while mother's sister (Crystal Hilton), Crystal's boyfriend, and P.G. lived in a home on the same property at the "bottom of the hill." The Department intervened that same month after receiving reports that mother "was using Percocet heavily and had been observed speaking to [J.F.] in a very negative way and yelling at him."

---

[2] Although the record in this case was sealed, "this appeal requires unsealing certain portions to resolve the issues raised by the parties." *Mintbrook Devs., LLC v. Groundscapes, LLC*, 76 Va. App. 279, 283 n.1 (2022). We unseal only those portions of the record that contain the facts mentioned in this opinion; the rest of the record remains sealed. *Id.*

When the Department went to visit mother's home the next day, it learned that mother was at the hospital in Richmond with P.G., who "had overdosed the previous night" after attempting to commit suicide by "taking a whole bunch of pills." When the hospital released P.G., it provided mother with contact information for counseling services and instructions regarding P.G.'s supervision and care, including removing all weapons from the home.

Upon P.G.'s release from the hospital, mother allowed her son to return to Crystal's home rather than stay with mother, despite her knowing that Crystal used drugs and that Crystal's boyfriend had pending drug charges. On February 20, 2021, about a week after his release from the hospital, P.G. committed suicide by using a firearm. He left a note stating that "he was tired of the drugs, the hate, and the fighting." Father was incarcerated at the time P.G. committed suicide.

Several days later, the Department returned to mother's home and met with father, who "had recently been bonded from jail and was in the home." Father told the Department that he believed that the gun P.G. had used to commit suicide had belonged to mother's brother, who father claimed was a felon on the North Carolina sex offender registry and was selling drugs out of Crystal's home. Father reported that mother and P.G. "did not have a good relationship" and that P.G. "had no respect for his mother because of the things that she had said and done to him." Father was concerned about mother's drug use and "the way that she spoke to the children" because he claimed that she had called them derogatory names, which mother denied. Father admitted to having a "little problem with meth" himself — and that he had been arrested for driving under the influence in December 2020.

Following its investigation, the Department made "Level 1 findings for physical neglect, lack of supervision" against mother for I.A., J.F., and P.G. The Department did not make any findings against father. The Department petitioned to remove I.A. and J.F. from mother's home,

- 3 -

and the children entered foster care on February 26, 2021.  The King and Queen County Juvenile and Domestic Relations District Court (the "JDR court") adjudicated that I.A. and J.F. were abused or neglected, and it entered dispositional orders.

After the children entered foster care, the Department established certain requirements that father had to meet before he could be reunited with I.A.  Those requirements were that he "was responsible for maintaining sobriety and abstaining from all illegal substances, to include those that are not prescribed to him"; he "was responsible for attending and participating and following all recommendations of a substance use assessment"; he was "responsible for attending and participating in and following all recommendations of a mental health assessment and individual counseling appointments, develop coping skills and demonstrate them"; he was "responsible for attending appointments, completing and following all recommendations of the parenting capacity evaluation"; he was "responsible for participating in the parent coaching sessions, attending and participating in visitation and parenting time appointments and demonstrating appropriate behavior during the visitation"; and he was "responsible for maintaining safe, stable, and appropriate housing."

Father completed a parental capacity evaluation.  The evaluators found that father "has significant mental health diagnoses" and that he "is reportedly self-medicating with expired prescriptions and methamphetamine."  Noting that father "appeared to become overwhelmed easily," the evaluators expressed significant concerns about his "ability to keep the children safe and adequately meet their developmental needs without additional support."  According to the evaluators, father thought "he was capable of caring for the children on his own but was unable to identify any support system to aid him in this effort should the chance arise."  The evaluators recommended that father "participate in an intensive outpatient substance abuse program" and, if unsuccessful, then enter inpatient treatment.  They also recommended that father complete an

individualized parenting program, parenting mentor services, a psychological evaluation, a medication evaluation, and either co-parenting counseling or couples counseling with mother.

Father did not complete the mental health assessment, and he did not attend individual counseling. Father also failed to participate in any individualized parenting programs or co-parenting counseling. Beginning in March 2021, the Department referred father to the Community Services Board for a substance abuse assessment and treatment. Although father completed the intake process, he did not start treatment.

In July 2021, father was placed on probation for five years following his conviction for possession of a Schedule I or II controlled substance. Father was directed to attend drug and alcohol treatment, to remain drug and alcohol free, to pay his court costs, to obey all laws, to report any arrests, to maintain employment, to be truthful and cooperative, to not change his address, to not possess a firearm, and to not travel outside the designated area or abscond from supervision. When asked about his criminal history, father admitted to having numerous convictions, including multiple drug offenses, grand larceny, uttering, and traffic matters.

Between September 2021 and May 2022, father participated in substance abuse treatment at the Gloucester County Community Services Board, but he did not successfully complete the program because he broke confidentiality in the group sessions and then stopped attending the group sessions altogether. In December 2021, father tested positive for oxycodone, amphetamines, buprenorphine, and lorazepam. In March 2022, he again tested positive for amphetamines. The evaluator noted that father had "very little insight into his drug addiction" and he had "very distorted thinking."

In July 2022, father tested positive for methamphetamine and amphetamines. That same month, he began substance abuse treatment at the Master Center for Addiction Medicine, an outpatient substance abuse treatment facility. In September 2022, father admitted to using

methamphetamine. The program team at the Master Center then recommended "a higher level of care" for father that included inpatient treatment. A peer recovery specialist described father as "struggling with substance abuse problems" and his mental health.

After father's failed attempts at outpatient treatment, his probation officer advised him that an inpatient substance abuse treatment program was "the only other option in lieu of going back to court." In October 2022, father attended an inpatient program, but he returned to the Master Center in November 2022 because he contracted COVID-19. After attending inpatient treatment, father had negative drug screens, he showed signs of progress in his recovery, and he attended therapy through the Master Center. He also completed a community 12-step program called 90 in 90, in which he attended 90 12-step meetings in 90 days. The Master Center emphasized father's need to continue engaging in his recovery activities.

In addition to the other services that the Department provided, the Department offered supervised visitation to father and mother, both of whom regularly attended visitation and acted appropriately with the children. The Department reported that the children were happy and enjoyed visiting with father and mother.

While the children were in foster care, the Department was unable to find viable relative placements for the children. The Department requested through the Interstate Compact on the Placement of Children ("ICPC") that the Department of Social Services in North Carolina investigate the home of mother's cousin, but it did not approve the placement following its investigation. The Department declined to further pursue that possible placement. In September 2022, the Department met with father and mother to discuss other possible relative placements. Father conceded that "he was just not ready to take custody of [I.A.]," but he noted at the time that he was then planning to go to an inpatient substance abuse treatment program. Father suggested his adult son as a possible placement, but his adult son did not respond to the

Department's calls, and he did not contact the Department. A week or two after the meeting, father admitted that "he had messed up" by using drugs, but he reiterated his intention to go to an inpatient treatment facility. Mother, on the other hand, "was adamant that she was going to get her boys back," and she maintained that she had only tested positive for drugs because she had touched dollar bills at her workplace and had undergone recent medical procedures. Mother provided the Department with contact information for her aunt who lived out-of-state and the Department requested a home study through the ICPC, but the results were not available at the time of the circuit court's termination hearing. Mother's sister, Crystal, died while the children were in foster care.

After father failed to complete the Department's requirements, the Department petitioned for the termination of his parental rights to I.A. On October 28, 2022, the JDR court terminated father's parental rights to I.A. Father appealed the JDR court's rulings to the circuit court.

At the circuit court's termination hearing, the Department presented evidence that I.A. and J.F. live in the same foster home together and that they have a close relationship. The Department reported that I.A., who was then three years old, was "doing well in the foster home," but he had been showing some "forms of aggression." He participated in speech therapy, which "has tremendously improved his speech."

The Department noted that father "seemed to be consistently concerned" with what mother was doing. Although father and mother separated and reunited several times while the children were in foster care, father remained extremely concerned with mother and her activities. Father stated that mother and her sister provided him with drugs.

Father testified that he lived in Gloucester with his nephew, his nephew's girlfriend, and their son. Father admitted that his nephew is a sex offender, that his nephew's girlfriend "uses a lot of marijuana," and that his nephew and girlfriend go to a methadone clinic. However, father

- 7 -

maintained that it was not a problem for him to be around drugs and drug users because he regularly attended 12-step meetings. Father recognized that his living situation was "not a good environment" for I.A., but he claimed that he could move to his brother's home in Yorktown, and then into a home that was currently under construction across the street from his brother's home. Father explained that he had not yet moved there because he worked in Gloucester with a contractor and because his probation was in Gloucester.

Father acknowledged that illegal drugs were present in the home when J.F. and I.A. lived with him and mother, but he claimed that neither he nor mother used drugs in front of the children. Father also acknowledged that he and mother often argued, which at times led to physical violence. Despite their turbulent history, father maintained that he and mother did not need co-parenting counseling. Father claimed that he and mother were no longer in a romantic relationship, but he admitted that he and mother engaged in sexual relations two months before the circuit court's termination hearing. In addition, father testified that he last used methamphetamine in August 2022. Father stated that he went once a month to the Master Center for his prescriptions and biweekly to meet with his therapist. He also started seeing a psychiatrist, and he noted that he had tried to attend parenting classes but had not done so. Father recognized that he was not yet in a position for I.A. to come home with him.

Mother testified that she lived alone in the same home from which the children had been removed by the Department. Although mother acknowledged that she and father were romantically involved as recently as two months before the circuit court's termination hearing, she did not think that they had a healthy relationship. She admitted that she and father were physically violent with one another, sometimes in front of the children, but she claimed that they had improved their co-parenting relationship since the children entered foster care.

After hearing the evidence and arguments, the circuit court found that father and mother had engaged in "rampant drug use" and that "these three children initially were abused and neglected." The judge commended father and mother for "making strides in trying to get your lives back in order and on the right path," but he noted that it took father "almost a year and a half for the light bulb to come on." In addition, the circuit court found that neither father nor mother had completed the Department's requirements despite the children having been in foster care for approximately two years. Neither father nor mother had viable plans or appropriate housing for the children. In short, the circuit court found that neither father nor mother had substantially remedied the conditions that had led to the children's placement in foster care. On February 14, 2023, pursuant to Code § 16.1-283(B) and Code § 16.1-283(C)(2), the circuit court terminated father's parental rights to I.A. Father appeals.

## II. ANALYSIS

On appeal to this Court, father argues that the circuit court erred in terminating his parental rights under Code § 16.1-283(B) and Code § 16.1-283(C)(2) and finding that the termination was in the best interests of I.A.

"'On review of a trial court's decision regarding the termination of parental rights, we presume the trial court "thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests."'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

Code § 16.1-283(B) and Code § 16.1-283(C)(2) each provide an independent ground for terminating parental rights, and they each require that the child be in foster care, that the reasons for termination be proved by clear and convincing evidence, and that the decision to terminate be in the best interests of the child. *See City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 563 (2003). Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

This Court has explained that "[s]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)).

Here, the Department specifically required father to participate in and complete several services before he could be reunited with I.A. While father completed inpatient substance abuse treatment, he did not do so until I.A. had been in foster care for approximately a year and a half. The circuit court emphasized how long it took "for the light bulb to come on" for father. Father was also required to participate in parenting classes and to obtain a psychological evaluation, but he did not complete either service. The circuit court found that father had had ample opportunity to satisfy the Department's required services, but that he had failed to do so.

In addition, father was required to have stable and appropriate housing, but he readily admitted that his current housing arrangement was not appropriate for I.A. because his nephew, with whom he lived, was a convicted sex offender, and the occupants of the home used drugs.

- 10 -

The circuit court agreed with father that his home was not appropriate for I.A. Father offered to live with his brother if he received custody of I.A. until another suitable home became available, but the circuit court admonished father that he needed to come to court with a plan — instead of merely proposing to make future changes if he was awarded custody. At the time of the circuit court's termination hearing, I.A. had been in foster care for approximately two years, and father still was not in a position to care for his child. Therefore, considering the totality of the evidence in the record before this Court, we cannot say that the circuit court erred in terminating father's parental rights under Code § 16.1-283(C)(2), and we cannot say that the circuit court erred in finding that the termination was in the best interests of I.A.

As this Court has often stated, "[w]hen a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 574 n.9 (2018). In short, because the circuit court did not err in terminating father's parental rights under Code § 16.1-283(C)(2), we do not need to reach the question of whether father's parental rights also should have been terminated under Code § 16.1-283(B).

III. CONCLUSION

For all of the foregoing reasons, we do not disturb the circuit court's decision to terminate father's parental rights to I.A.

*Affirmed.*

- 11 -