COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Callins and Frucci
Argued at Salem, Virginia

UNPUBLISHED

TRACY LYNN CLINE

v.          Record No. 1963-23-3

CITY OF ROANOKE DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION[*] BY
JUDGE STEVEN C. FRUCCI
OCTOBER 29, 2024

FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
David B. Carson, Judge

John S. Koehler (Ruth Blaskis; The Law Office of James Steele,
PLLC; The Law Office of Ruth Blaskis, on brief), for appellant.

James P. Cargill, Guardian ad litem for the minor child (Timothy R.
Spencer, City Attorney; Jennifer L. Crook, Assistant City Attorney;
James P. Cargill, P.C., on brief), for appellee.


Tracy Lynn Cline ("mother") appeals the order of the circuit court terminating her

parental rights to her minor child, D.R., under Code § 16.1-283(B), (C)(1), and (C)(2) and

approving the foster care goal of adoption.  Mother contends that the circuit court erred in

finding sufficient evidence to terminate her parental rights and that adoption was not in the best

interests of D.R.  For the following reasons, we affirm the ruling of the circuit court.

BACKGROUND[1]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable

to the prevailing party below, in this case the Department.'"  *Joyce v. Botetourt Cnty. Dep't of Soc.*

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The record in this case was sealed.  We unseal only the facts stated in this opinion to
resolve the issues presented.  *Brown v. Virginia*, 302 Va. 234, 240 n.2 (2023).  The rest of the
record remains sealed.

*Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)). So viewed, the evidence established the following relevant facts.

Mother and Timothy Alan Redman ("father")[2] are the biological parents of D.R. D.R. is sixteen years old and has been diagnosed with Down syndrome, autism, and attention deficit hyperactivity disorder; he is predominantly nonverbal.

## I. *D.R.'s First Placement in Foster Care*

The Roanoke City Department of Social Services (the "Department") first became involved with the family in 2011, when D.R. was three years old, due to concerns about mother's mental health, alcohol abuse, and potential physical abuse of D.R. because of visible bruises and scratches on his body. The Department began providing mother with several services in 2012 to prevent removal, including case management, in-home care, mental health support and counseling; mother "minimal[ly] compli[ed]" with the services the Department recommended. D.R. entered foster care for the first time in 2013 because mother reported "being overwhelmed with caring for [D.R.]" and was "in a constant state of crisis," which created a hostile environment for D.R. While D.R. was in foster care, the Department assisted mother in finding safe and stable housing. Mother regained custody of D.R. about five months later "with her agreement to be compliant and continue services."

## II. *D.R.'s Second Placement in Foster Care*

The Department intervened again in 2017, after it received a physical abuse report regarding the strangulation of D.R. by mother's longtime boyfriend (hereinafter referred to as "Jasper") with whom she had a history of domestic violence. D.R. had visible marks on his neck. After an investigation, the Department made a disposition of "founded" for level-two

---

[2] Father separately appealed the termination of his parental rights. *See Redman v. City of Roanoke Dep't of Soc. Servs.*, No. 1913-23-3.

physical abuse against Jasper, and he was not permitted contact with D.R. until he completed services to address the ongoing domestic violence concerns. Shortly after the strangulation incident, D.R. was found walking alone on the street in the early morning. D.R. was reportedly knocking on doors and shining a flashlight into houses. He was dressed in jeans that were stained, had no shoes on, and had dirt on his feet, hands, and face. D.R. was unable to identify himself and no reports of a missing child had come in, so he was transported to the Roanoke City Police Department. Because there was insufficient information to locate D.R.'s caregivers or to determine his identity, the Department decided to take him into emergency custody.

Eventually, upon returning to the Department's office, a worker recognized D.R. and assisted in identifying him. The police located mother at Jasper's house where mother and Jasper had been sleeping when D.R. left the home. Mother and Jasper stated they were unaware that D.R. should not be in contact with Jasper despite the previous founded complaint for physical abuse. Because of concerns over D.R.'s supervision and Jasper's continued involvement in his life, D.R. remained in foster care.

The Department again provided mother with services such as mental health counseling and medication management in order to return D.R. home to her. Mother assured the Department that she was no longer having contact with Jasper, and she was able to have weekend visitations with D.R. because of her progress. However, during one of the weekend visits, Jasper was found to be in the house with D.R. This resulted in D.R. being removed from the visit and mother's visitations were supervised at D.R.'s residential placement. Mother maintained regular visits, participated in services, obtained housing, achieved financial stability, and ultimately regained custody in July 2019, after D.R. had been in foster care for two years. One of the conditions of the reunification was that D.R. have no contact with Jasper.

III. *D.R.'s Third Placement in Foster Care*

Approximately seven months after D.R. returned home, the Department received a report that mother and Jasper had a physical altercation at her home while D.R. was present. The Department determined that mother had violated the Department's requirement that prohibited contact between D.R. and Jasper, so D.R. entered foster care for a third time in February 2020. Thereafter, the Department filed a foster care plan in the Juvenile and Domestic Relations District Court of Roanoke City ("JDR court") with the primary goal of relative placement and the concurrent goal of adoption. The JDR court approved the plan and ordered D.R. to remain in foster care. The Department later changed the goal to adoption and petitioned for termination of mother's parental rights. The JDR court approved the change and terminated mother's parental rights. Mother timely appealed to the circuit court, and, after a hearing, the circuit court overturned the JDR court's orders, and directed the Department to return D.R. to mother's custody. D.R. returned to mother's care in June 2021.

IV. *D.R.'s Fourth Placement in Foster Care*

In late 2021, father moved in with mother and D.R. following his release from incarceration. While living together, father and mother used methamphetamine. Mother kicked father out of her home near the end of 2021. In January 2022, the Department received a report of domestic abuse between mother and the biological father of her adult son. D.R., then fourteen years old, was present in the house during the incident.

In February 2022, the Department asked mother to complete a hair-follicle drug screen, but she refused. The JDR court later ordered her to submit to the screening, which was positive for methamphetamine and cocaine. The Department immediately removed D.R. from mother's care, for the fourth time, based on the results of her drug test and her lengthy history with the Department.

- 4 -

The JDR court entered emergency and preliminary removal orders and adjudicated that D.R. had been, or was at risk of being, abused or neglected. The Department then filed a foster care plan with the primary goal of relative placement and a concurrent goal of adoption, which the JDR court approved, and the circuit court affirmed. This Court upheld the dispositional order on appeal in a consolidated opinion addressing mother and father's appeals. *See Redman v. Roanoke City Dep't of Soc. Servs.*, Nos. 0098-23-3, 0156-23-3, 2024 Va. App. LEXIS 265 (May 14, 2024). The JDR court later entered orders approving the Department's permanent foster care goal of adoption and terminating mother's parental rights. Mother appealed the JDR court's orders to the circuit court.

At the circuit court hearing, Dr. Klaire Mundy, a licensed psychologist, testified that she had conducted two parental capacity evaluations on mother, one in 2018, and another in 2022. Mother acknowledged to Dr. Mundy that she had discontinued Department-required services after D.R. returned to her care. Mother also admitted to Dr. Mundy that D.R. had been exposed to domestic violence in her home.

Dr. Mundy reported that mother had a history of trauma, which led "to a risk of chronic illness, social problems, increased risk for toxic relationships, [and] increased risk for poor quality of life." Indeed, Dr. Mundy opined that mother had a "very poor pattern of engaging in relationships that" caused harm to both her and D.R. Moreover, Dr. Mundy found that although mother loved D.R., she had been "unsuccessful in incorporating the tools that she ha[d] been taught through counseling." Dr. Mundy concluded that mother "ha[d] not taken advantage of all the things that she has had in front of her to get to the rehabilitative place that she needs to be to keep herself and [D.R.] secure."

The Department also offered testimony that D.R. was doing "really well" while in foster care and had made "a tremendous amount of progress" in the months preceding the circuit court

hearing.  D.R. had demonstrated growth in schooling, and his foster parent was thoroughly engaged in D.R.'s services.  During mother's testimony, she admitted that she was involved in a physical altercation in her home in January 2022, while D.R. was present.  Mother also acknowledged that she had used methamphetamine in 2021.

After considering the evidence and arguments, the circuit court terminated mother's parental rights under Code § 16.1-283(B), (C)(1), and (C)(2), and it approved the foster care goal of adoption.  Mother appeals.

Mother argues that the circuit court erred in terminating her parental rights because the Department failed to prove that termination was in D.R.'s best interest.  Mother contends that the Department did not prove that: she failed to remedy the conditions that led to D.R.'s foster care placement; D.R. suffered abuse and neglect that substantially created a serious and substantial threat to his life, health, and development; she failed to maintain contact with D.R.  She further argues that the Department failed to make reasonable efforts to reunite D.R. with her.

ANALYSIS

"In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests."  *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)).  "On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'"  *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)).  "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to

support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

Code § 16.1-283(C)(2) authorizes a court to terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which [s]he has been offered rehabilitation services." *Toms*, 46 Va. App. at 271 (quoting *City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 562 (2003)).

Mother argues the record contains evidence that she was willing to remedy the circumstances leading to D.R.'s placement in foster care. She notes that she engaged in therapy and medication management since the Department became involved with the family. Mother also highlights that, although not required by the Department, she participated in group therapy and put her name on a waiting list for individual therapy following D.R.'s fourth removal from her care.

We are unpersuaded by mother's argument. Since D.R. first entered foster care in 2013, the Department provided mother with numerous services, including referrals for outpatient therapy, case management, medication management, and parenting classes. Although mother initially engaged in those services, she did not continue to do so after the Department returned D.R. to her

care. Moreover, despite mother's engagement in some services over the years, she continued to engage in negative relationships that exposed D.R. "to violence and domestic violence and drug use." Indeed, while D.R. was in mother's care, mother was involved in several domestic violence incidents in D.R.'s presence and she had used illegal narcotics. Although mother claims that she had engaged in therapy after D.R.'s most recent removal, the record reflects that she already had significantly more than a "reasonable period of time" to remedy the conditions that led to D.R.'s removal.

The record also contains evidence that D.R. was thriving in foster care. D.R. was in foster care for a total of three years and ten months for the first three removals. Since the most recent removal, D.R. had been in care for 13 months at the time of the circuit court's hearing. A child languishing in foster care is left with the prospect that he or she has but one shot at a positive and productive childhood, and "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Simms*, 74 Va. App. at 463 (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 162 (2004)). Based on this record, the circuit court's termination of mother's parental rights is not "plainly wrong or without evidence to support it." *Id.* at 470 (quoting *Ridgeway*, 59 Va. App. at 190).[3]

---

[3] "When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9; *see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Given our conclusion that the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2), we do not address whether it properly relied on Code § 16.1-283(B) or (C)(1) when it terminated mother's parental rights.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*