COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Malveaux, Fulton and White
Argued by videoconference


MORGAN ANNE SELF

                                            MEMORANDUM OPINION[*] BY
v.       Record No. 0929-24-3          JUDGE MARY BENNETT MALVEAUX
                                              DECEMBER 10, 2024

CITY OF BRISTOL DEPARTMENT OF
  SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF BRISTOL
Sage B. Johnson, Judge

David B. Childers for appellant.

Matthew B. Crum (William T. Rasnic, Guardian ad litem for the
minor children, on brief), for appellee.


Morgan Anne Self ("mother") appeals the circuit court's order terminating her residual

parental rights to her minor children.  She contends the court erred in finding the evidence

sufficient to terminate her residual parental rights pursuant to Code § 16.1-283(B) and (C)(2).

For the following reasons, we affirm the circuit court.

## I.  BACKGROUND[1]

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable

to the prevailing party below'"—in this case, the City of Bristol Department of Social Services

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The record in this case was sealed, but resolving mother's appeal necessitates unsealing
relevant portions of the record.  Evidence and factual findings below that are necessary to
address the issues on appeal are included in this opinion.  "Consequently, '[t]o the extent that this
opinion mentions facts found in the sealed record, we unseal only those specific facts, finding
them relevant to the decision in this case.  The remainder of the previously sealed record remains
sealed.'"  *Norfolk Dep't of Hum. Servs. v. Goldberg*, 81 Va. App. 667, 673 n.1 (2024) (alteration
in original) (quoting *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017)).

("DSS"). *Joyce v. Botetourt Cnty. Dep't of Soc. Servs.*, 75 Va. App. 690, 695 (2022) (quoting *Farrell v. Warren Cnty. Dep't of Soc. Servs.*, 59 Va. App. 375, 386 (2012)).[2]

Mother and James Reed ("father") are the biological parents of T., N., and M.[3] DSS became involved with the family in March 2022 when M., then seven months old, was attacked in the home by the family dog. The attack left M. bleeding, "covered . . . in small scratches," and missing part of an earlobe. Despite the severity of M.'s injuries, her parents did not contact emergency services; instead, mother called the children's maternal grandmother and asked her to come get M. because M. needed to go to the hospital. Instead, the children's grandmother called 911 and M. was taken to the hospital by ambulance.

DSS discussed the incident with mother, who explained that she and father had been napping at around 1:00 p.m. and woke up to find the dog in M.'s crib. Mother confirmed that after seeing M.'s injuries, she called the children's grandmother to come and take M. to the hospital. When DSS asked why mother did not instead call 911, she stated "I don't know, I have seizures, I was upset." Police investigated the incident and found "inconsistencies" in the family's stories

---

[2] The transcript of the termination hearing in this case was untimely filed; it is thus not part of the record on appeal and we do not discuss any facts from the transcript in this opinion. *See* Rule 5A:8(a) (only transcripts filed within 60 days after final judgment are part of the record).

Additionally, we conclude that the transcript is not indispensable to the resolution of this appeal. *See* Rule 5A:8(b)(4)(ii) ("When the appellant fails to ensure that the record contains transcripts or a written statement of facts necessary to permit resolution of appellate issues, any assignments of error affected by such omission will not be considered."); *Smith v. Commonwealth*, 32 Va. App. 766, 771 (2000) ("If . . . the transcript is indispensable to the determination of the case, then the requirements for making the transcript a part of the record on appeal must be strictly adhered to. This Court has no authority to make exceptions to the filing requirements set out in the Rules." (alteration in original) (quoting *Turner v. Commonwealth*, 2 Va. App. 96, 99 (1986))). Here, although the termination hearing transcript is not part of the record on appeal, the record does contain numerous DSS filings, expert reports, and trial exhibits sufficient for us to resolve the issues raised on appeal.

[3] We refer to the minor children by their initials to protect their privacy.

concerning the timeline of events. These inconsistencies raised "suspicion" that the incident had "occurred earlier in the morning" and the family had waited several hours to seek help.

DSS visited the family home and found "trash, feces, and old food all over the floors," in addition to a plate within the children's reach "that had tobacco and cigarettes on it." DSS executed an emergency removal of M., three-year-old T., and one-year-old N. The removal was based on DSS's concerns about the condition of the home and that the failure to seek medical attention for M. for an "extended amount of time" demonstrated the parents' lack of "protective capacities" to ensure the children's safety.

During the next month, the juvenile and domestic relations district court ("JDR court") held a preliminary removal hearing and an adjudicatory hearing on the issue of abuse and neglect; both parents stipulated to a finding of abuse or neglect and that the children remain for the time in foster care. The JDR court later entered dispositional orders approving an initial foster care goal of returning the children home with a concurrent goal of relative placement.

In April 2022, Dr. Rick Carroll, a licensed professional counselor, conducted a parental capacity evaluation of mother for DSS. Mother acknowledged to Dr. Carroll that her home "was not a suitable place for the kids" and that she "could not keep up with housekeeping and going through their clothes that did not fit" due to her depression. She also told Dr. Carroll that father had hit her and called her names in front of the children and admitted she had "hit [father] also." Mother indicated that she did "not want[] to be with" father any longer after the children's removal to foster care, and explained she was currently living with relatives and an unrelated, incapacitated adult. Mother did not have her own room in the home due to its "cramped conditions," and she had no response when Dr. Carroll asked her what living arrangements she had in mind if the children were returned to her care. Mother did not have a driver's license and relied on others for transportation.

In addition, mother did not have a job; she had "worked at McDonald[']s for a while, but that only lasted a few months."

Based on his evaluation, Dr. Carroll diagnosed mother with major depressive disorder and severe persistent depressive disorder. Due to concerns about mother's lack of a support system, her significant history of abuse and neglect, and her mental health issues, Dr. Carroll concluded that his "prognosis [was] extremely guarded" regarding whether mother could "becom[e] self-sufficient to the point of having these children successfully returned to her care." Nevertheless, Dr. Carroll made several recommendations for her that were "aimed at meeting the goal of family reunification." He recommended that mother receive outpatient counseling to address her mental health concerns, learn about healthy relationships and address her dependency issues, receive instruction on money management, and complete a parenting curriculum focused on meeting the needs of young children. Dr. Carroll noted the importance of mother securing adequate housing and obtaining her driver's license to reduce her dependency on others for transportation.

Mother enrolled in individual counseling, although DSS noted that she did not "follow[] through with participating regularly." In addition to taking parenting classes, mother worked with a parent advocate on budgeting and hygiene skills, obtaining a learner's permit, and overcoming anxiety about taking public transportation. Mother also moved into an apartment. Still, she continued to struggle with budgeting and was unable to maintain consistent employment.

DSS provided mother supervised time with the three children. Mother and father informed DSS they intended to reunite, and DSS began offering them two hours per week of joint supervised family time. Both parents appeared "exhausted" by the end of the visitations.

In June 2023, mother ended her relationship with father and obtained a protective order against him, so DSS altered the visitation schedule to provide each parent with two hours of individual supervised family time on alternating weeks. Mother regularly attended her scheduled

- 4 -

visits. DSS declined to offer mother unsupervised visits with the children "due to concerns for the safety of the children should they be left unsupervised in her care." DSS also observed that mother "require[d] support during the visits to help with managing her children." Mother told DSS she "[could] []not care for her children without support" and that she lacked any support system outside the services provided by DSS.

DSS had placed T. and N. together in the same therapeutic foster home; M. was in a separate therapeutic foster home but had regular "play dates" with T. and N. Before entering foster care, none of the children regularly saw a pediatrician or had up-to-date immunizations. All three children suffered from a "lack of nutrition" requiring that they take iron supplements. Initially, N. exhibited behavioral issues such as head banging and biting other children. T. "struggled immensely with potty training due to trauma." N. was non-verbal and both N. and T. exhibited developmental delays. After entering foster care, N. and T. began attending school, where they each qualified for an individualized education plan. N. and T. participated in occupational therapy, speech therapy, physical therapy, and trauma-focused play therapy. T. made "great strides in his ability to communicate and function" at the foster home and his verbal skills increased to the point that he could "string together small phrases." N.'s behavioral issues decreased and he began "using bigger words" and "putting together . . . small two word sentences."

In addition to the injuries sustained in the dog attack, M. displayed developmental delays upon entering foster care. M. was enrolled in infant and toddler early intervention services but later stopped needing those services because she was "me[eting] all necessary milestones" and exceeding developmental expectations for her age group. M. saw a plastic surgeon for the injury to her ear but was unable to have surgery to correct the damage "until she . . . reached adulthood and stopped growing."

T., N., and M. "thrive[d]" in foster care. But the children's foster parents expressed concerns that the children were "not handl[ing] the visitations [with mother] well." T. and N. were reported to have increased nightmares, behavioral issues, and toileting accidents immediately following the visitations. T. and N. were otherwise fully toilet trained by this point and only had accidents during and directly after visits with mother. M. had trouble sleeping after visits; she "scream[ed] at night and h[ad] to be consoled."

In August 2023, DSS petitioned the JDR court to terminate mother's residual parental rights to all three children and change their foster care goals to adoption. DSS acknowledged that mother maintained consistent communication with DSS, was "compliant" with its requirements, and showed willingness to participate in services. Yet DSS also was concerned that mother had not shown improvement in her "protective capabilities" as a parent. In DSS's opinion, mother continued to show "a great deficit in her ability to effectively parent her children" and lacked the ability to independently provide for their continued safety, well-being, and permanency. On September 21, 2023, the JDR court entered orders terminating mother's residual parental rights to the three children and approving foster care goals of adoption.[4] Mother appealed to the circuit court.

After hearing evidence and arguments on December 11, 2023, the circuit court terminated mother's residual parental rights to T., N., and M. pursuant to both Code § 16.1-283(B) and (C)(2). The court also approved the foster care goal of adoption for the three children.

This appeal followed.

## II. ANALYSIS

Mother argues that the circuit court erred in finding the evidence sufficient to terminate her residual parental rights pursuant to Code § 16.1-283(C)(2). She contends the evidence

---

[4] The JDR court also terminated father's residual parental rights to all three children.

showed that she was "willing[] to remedy her situation," because she had "achieved every goal, completed every class, and . . . participated in every program or endeavor offered [to her] by [DSS]." Additionally, she had secured appropriate housing, financial stability, a driver's license, and a reliable vehicle. Yet despite these efforts, mother argues, DSS "never afforded [her] the opportunity . . . to show she was *able* to remedy her situation" because it "never allowed her to have family counseling sessions with her children," "participate in their occupational or physical therapy," and "show she could properly parent her children through increased visitations." Thus, mother contends, DSS failed to "take reasonable and appropriate steps" to allow mother the opportunity to demonstrate she had substantially remedied the conditions requiring the children's removal to foster care.

Code § 16.1-283(C)(2) provides that a parent's residual parental rights can be terminated if the court finds, by "clear and convincing evidence," that termination is in the child's best interest and that:

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 552 (2018) (alteration in original) (quoting *Toms v. Hanover Dep't of Soc. Servs.*, 46 Va. App. 257, 271 (2005)). "'[R]etrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered

rehabilitation services." *Toms*, 46 Va. App. at 271 (quoting *City of Newport News Dep't of Soc. Servs. v. Winslow*, 40 Va. App. 556, 562 (2003)).

"In matters of a child's welfare, trial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "On review of a trial court's decision regarding the termination of parental rights, we presume the trial court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" *Joyce*, 75 Va. App. at 699 (quoting *Norfolk Div. of Soc. Servs. v. Hardy*, 42 Va. App. 546, 552 (2004)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Simms v. Alexandria Dep't of Cmty. & Hum. Servs.*, 74 Va. App. 447, 470 (2022) (quoting *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011)).

The record supports the circuit court's termination of mother's residual parental rights pursuant to Code § 16.1-283(C)(2). When the children were removed to foster care, DSS was concerned with mother's lack of "protective capacities" to keep the children safe in her care. After completing services and participating in visitation provided by DSS, mother still had not shown improvement in her "protective capabilities" as a parent and continued to lack the ability to independently provide for her children's safety. Mother admitted her inability to independently care for the children without support. In addition, mother's continued struggles with budgeting and maintaining consistent employment further showed an inability to function independently. Code § 16.1-283(C)(2) requires DSS to prove that a parent is unwilling or unable to remedy substantially the conditions that required the child's foster care placement. Thus, even if the evidence demonstrated mother's willingness to participate in services and comply with DSS's

requirements, the evidence supports the finding that she lacked the ability to address the lack of protective capacity that resulted in her children entering foster care.

This Court has held that "the 'reasonable and appropriate' efforts of [DSS] can only be judged with reference to the circumstances of a particular case and that 'a court must determine what constitutes reasonable and appropriate efforts given the facts before the court.'" *Joyce*, 75 Va. App. at 701 (quoting *Harrison v. Tazewell Cnty. Dep't of Soc. Servs.*, 42 Va. App. 149, 163 (2004)). DSS specifically declined to provide unsupervised visits to mother based on its concerns for the children's safety if the children were placed in mother's care unsupervised. During the supervised visits, DSS observed that mother was not able to manage the children without support. In addition, the children's foster parents reported concerning behaviors in the children directly after their visits with mother. Given the evidence in the record, the supervised visitation that DSS provided to mother was reasonable and appropriate.

Mother also contends that the circuit court erred in finding the evidence sufficient to terminate her residual parental rights pursuant to Code § 16.1-283(B). But "[w]hen a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9; *see also Fields v. Dinwiddie Cnty. Dep't of Soc. Servs.*, 46 Va. App. 1, 8 (2005) (affirming termination of residual parental rights under one subsection of Code § 16.1-283 and declining to address termination under any other subsection relied upon by the circuit court). Having found that the circuit court did not err in terminating mother's residual parental rights to her three minor children pursuant to Code § 16.1-283(C)(2), we need not address whether mother's residual parental rights were also properly terminated pursuant to Code § 16.1-283(B).

## III.  CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

*Affirmed.*